[No. S014349. Aug. 30, 1991.]

FRANCES KINLAW et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

**COUNSEL**

Stephen D. Schear, Stephen E. Ronfeldt, Armando M. Menocal III, Lois Salisbury, Laura Schulkind and Kirk McInnis for Plaintiffs and Appellants.

Catherine I. Hanson, Astrid G. Meghrigian, Alice P. Mead, Alan K. Marks, County Counsel (San Bernardino), Paul F. Mordy, Deputy County Counsel, De Witt W. Clinton, County Counsel (Los Angeles), Robert M. Fesler, Assistant County Counsel, Frank J. DaVanzo, Deputy County Counsel, Weissburg & Aronson, Mark S. Windisch, Carl Weissburg and Howard W. Cohen as Amici Curiae on behalf of Plaintiffs and Appellants.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, N. Eugene Hill, Assistant Attorney General, Richard M. Frank, Asher Rubin and Carol Hunter, Deputy Attorneys General, for Defendants and Respondents.

## OPINION

**BAXTER, J.**—Plaintiffs, medically indigent adults and taxpayers, seek to enforce section 6 of article XIII B (hereafter, section 6) of the California Constitution through an action for declaratory and injunctive relief. They invoked the jurisdiction of the superior court as taxpayers pursuant to Code of Civil Procedure section 526a and as persons affected by the alleged failure of the state to comply with section 6. The superior court granted summary judgment for defendants State of California and Director of the Department of Health Services, after concluding that plaintiffs lacked standing to prosecute the action. On appeal, the Court of Appeal held that plaintiffs have standing and that the action is not barred by the availability of administrative remedies.

We reverse. The administrative procedures established by the Legislature, which are available only to local agencies and school districts directly affected by a state mandate, are the exclusive means by which the state's obligations under section 6 are to be determined and enforced. Plaintiffs therefore lack standing.

### I

### STATE MANDATES

Section 6, adopted on November 6, 1979, as part of an initiative measure imposing spending limits on state and local government, also imposes on the state an obligation to reimburse local agencies for the cost of most programs and services which they must provide pursuant to a state mandate if the local agencies were not under a preexisting duty to fund the activity. It provides:

"Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the state shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service, except that the Legislature may, but need not, provide such subvention of funds for the following mandates:

"(a) Legislative mandates requested by the local agency affected;

"(b) Legislation defining a new crime or changing an existing definition of a crime; or

"(c) Legislative mandates enacted prior to January 1, 1975, or executive orders or regulations initially implementing legislation enacted prior to January 1, 1975."

A complementary provision, section 3 of article XIII B, provides for a shift from the state to the local agency of a portion of the spending or "appropriation" limit of the state when responsibility for funding an activity is shifted to a local agency:

"The appropriations limit for any fiscal year . . . shall be adjusted as follows: [¶] (a) In the event that the financial responsibility of providing services is transferred, in whole or in part, . . . from one entity of government to another, then for the year in which such transfer becomes effective the appropriations limit of the transferee entity shall be increased by such reasonable amount as the said entities shall mutually agree and the appropriations limit of the transferor entity shall be decreased by the same amount."

II

PLAINTIFFS' ACTION

The underlying issue in this action is whether the state is obligated to reimburse the County of Alameda, and shift to Alameda County a concomitant portion of the state's spending limit, for the cost of providing health care services to medically indigent adults who prior to 1983 had been included in the state Medi-Cal program. Assembly Bill No. 799 (1981-1982 Reg. Sess.) (AB 799) (Stats. 1982, ch. 328, p. 1568) removed medically indigent adults from Medi-Cal effective January 1, 1983. At the time section 6 was adopted, the state was funding Medi-Cal coverage for these persons without requiring any county financial contribution.

Plaintiffs initiated this action in the Alameda County Superior Court. They sought relief on their own behalf and on behalf of a class of similarly

situated medically indigent adult residents of Alameda County. The only named defendants were the State of California, the Director of the Department of Health Services, and the County of Alameda.

In the complaint for declaratory and injunctive relief, plaintiffs sought an injunction compelling the state to restore Medi-Cal eligibility to medically indigent adults or to reimburse the County of Alameda for the cost of providing health care to those persons. They also prayed for a declaration that the transfer of responsibility from the state-financed Medi-Cal program to the counties without adequate reimbursement violated the California Constitution.[1]

At the time plaintiffs initiated their action neither Alameda County, nor any other county or local agency, had filed a reimbursement claim with the Commission on State Mandates (Commission).[2]

Whether viewed as an action seeking restoration of Medi-Cal benefits, one to compel state reimbursement of county costs, or one for declaratory relief, therefore, the action required a determination that the enactment of AB 799 created a state mandate within the contemplation of section 6. Only upon resolution of that issue favorably to plaintiffs would the state have an obligation to reimburse the county for its increased expense and shift a portion of its appropriation limit, or to reinstate Medi-Cal benefits for plaintiffs and the class they seek to represent.

The gravamen of the action is, therefore, enforcement of section 6.[3]

---

[1]The complaint also sought a declaration that the county was obliged to provide health care services to indigents that were equivalent to those available to nonindigents. This issue is not before us. The County of Alameda aligned itself with plaintiffs in the superior court and did not oppose plaintiffs' effort to enforce section 6.

[2]On November 23, 1987, the County of Los Angeles filed a test claim with the Commission. San Bernardino County joined as a test claimant. The Commission ruled against the counties, concluding that no state mandate had been created. The Los Angeles County Superior Court subsequently granted the counties' petition for writ of mandate (Code Civ. Proc., § 1094.5), reversing the Commission, on April 27, 1989. (No. C-731033.) An appeal from that judgment is presently pending in the Court of Appeal. (*County of Los Angeles* v. *State of California*, No. B049625.)

[3]Plaintiffs argue that they seek only a declaration that AB 799 created a state mandate and an injunction against the shift of costs until the state decides what action to take. This is inconsistent with the prayer of their complaint which sought an injunction requiring defendants to restore Medi-Cal eligibility to all medically indigent adults until the state paid the cost of full health services for them. It is also unavailing.

An injunction against enforcement of a state mandate is available only after the Legislature fails to include funding in a local government claims bill following a determination by the

III

ENFORCEMENT OF ARTICLE XIII B, SECTION 6

In 1984, almost five years after the adoption of article XIII B, the Legislature enacted comprehensive administrative procedures for resolution of claims arising out of section 6. (§ 17500.) The Legislature did so because the absence of a uniform procedure had resulted in inconsistent rulings on the existence of state mandates, unnecessary litigation, reimbursement delays, and, apparently, resultant uncertainties in accommodating reimbursement requirements in the budgetary process. The necessity for the legislation was explained in section 17500:

"The Legislature finds and declares that the existing system for reimbursing local agencies and school districts for the costs of state-mandated local programs has not provided for the effective determination of the state's responsibilities under Section 6 of Article XIII B of the California Constitution. The Legislature finds and declares that the failure of the existing process to adequately and consistently resolve the complex legal questions involved in the determination of state-mandated costs has led to an increasing reliance by local agencies and school districts on the judiciary and, therefore, in order to relieve unnecessary congestion of the judicial system, *it is necessary to create a mechanism which is capable of rendering sound quasi-judicial decisions and providing an effective means of resolving disputes over the existence of state-mandated local programs.*" (Italics added.)

In part 7 of division 4 of title 2 of the Government Code, "State-Mandated Costs," which commences with section 17500, the Legislature created the Commission (§ 17525), to adjudicate disputes over the existence of a state-mandated program (§§ 17551, 17557) and to adopt procedures for submission and adjudication of reimbursement claims (§ 17553). The five-member Commission includes the Controller, the Treasurer, the Director of Finance, the Director of the Office of Planning and Research, and a public member experienced in public finance. (§ 17525.)

The legislation establishes a test-claim procedure to expeditiously resolve disputes affecting multiple agencies (§ 17554),[4] establishes the method of

Commission that a state mandate exists. (Gov. Code, § 17612.) Whether plaintiffs seek declaratory relief and/or an injunction, therefore, they are seeking to enforce section 6.

All further statutory references are to the Government Code unless otherwise indicated.

[4]The test claim by the County of Los Angeles was filed prior to that proposed by Alameda County. The Alameda County claim was rejected for that reason. (See § 17521.) Los Angeles County permitted San Bernardino County to join in its claim which the Commission accepted

payment of claims (§§ 17558, 17561), and creates reporting procedures which enable the Legislature to budget adequate funds to meet the expense of state mandates (§§ 17562, 17600, 17612, subd. (a).)

Pursuant to procedures which the Commission was authorized to establish (§ 17553), local agencies[5] and school districts[6] are to file claims for reimbursement of state-mandated costs with the Commission (§§ 17551, 17560), and reimbursement is to be provided only through this statutory procedure. (§§ 17550, 17552.)

The first reimbursement claim filed which alleges that a state mandate has been created under a statute or executive order is treated as a "test claim." (§ 17521.) A public hearing must be held promptly on any test claim. At the hearing on a test claim or on any other reimbursement claim, evidence may be presented not only by the claimant, but also by the Department of Finance and any other department or agency potentially affected by the claim. (§ 17553.) Any interested organization or individual may participate in the hearing. (§ 17555.)

A local agency filing a test claim need not first expend sums to comply with the alleged state mandate, but may base its claim on estimated costs. (§ 17555.) The Commission must determine both whether a state mandate exists and, if so, the amount to be reimbursed to local agencies and school districts, adopting "parameters and guidelines" for reimbursement of any claims relating to that statute or executive order. (§ 17557.) Procedures for determining whether local agencies have achieved statutorily authorized cost savings and for offsetting these savings against reimbursements are also provided. (§ 17620 et seq.) Finally, judicial review of the Commission decision is available through petition for writ of mandate filed pursuant to Code of Civil Procedure section 1094.5. (§ 17559.)

The legislative scheme is not limited to establishing the claims procedure, however. It also contemplates reporting to the Legislature and to departments and agencies of the state which have responsibilities related to funding state mandates, budget planning, and payment. The parameters and guidelines adopted by the Commission must be submitted to the Controller, who is to pay subsequent claims arising out of the mandate. (§ 17558.) Executive orders mandating costs are to be accompanied by an appropria-

as a test claim intended to resolve the issues the majority elects to address instead in this proceeding. Los Angeles County declined a request from Alameda County that it be included in the test claim because the two counties' systems of documentation were so similar that joining Alameda County would not be of any benefit. Alameda County and these plaintiffs were, of course, free to participate in the Commission hearing on the test claim. (§ 17555.)

[5] " 'Local agency' means any city, county, special district, authority, or other political subdivision of the state." (§ 17518.)

[6] " 'School district' means any school district, community college district, or county superintendant of schools." (§ 17519.)

tions bill to cover the costs if the costs are not included in the budget bill, and in subsequent years the costs must be included in the budget bill. (§ 17561, subds. (a) & (b).) Regular review of the costs is to be made by the Legislative Analyst, who must report to the Legislature and recommend whether the mandate should be continued. (§ 17562.) The Commission is also required to make semiannual reports to the Legislature of the number of mandates found and the estimated reimbursement cost to the state. (§ 17600.) The Legislature must then adopt a "local government claims bill." If that bill does not include funding for a state mandate, an affected local agency or school district may seek a declaration from the superior court for the County of Sacramento that the mandate is unenforceable, and an injunction against enforcement. (§ 17612.)

Additional procedures, enacted in 1985, create a system of state-mandate apportionments to fund reimbursement. (§ 17615 et seq.)

█ It is apparent from the comprehensive nature of this legislative scheme, and from the Legislature's expressed intent, that the exclusive remedy for a claimed violation of section 6 lies in these procedures. The statutes create an administrative forum for resolution of state mandate claims, and establishes procedures which exist for the express purpose of avoiding multiple proceedings, judicial and administrative, addressing the same claim that a reimbursable state mandate has been created. The statutory scheme also designates the Sacramento County Superior Court as the venue for judicial actions to declare unfunded mandates invalid (§ 17612).

The legislative intent is clearly stated in section 17500: "It is the intent of the Legislature in enacting this part to provide for the implementation of Section 6 of Article XIII B of the California Constitution and to consolidate the procedures for reimbursement of statutes specified in the Revenue and Taxation Code with those identified in the Constitution. . . ." And section 17550 states: "Reimbursement of local agencies and school districts for costs mandated by the state shall be provided pursuant to this chapter."

Finally, section 17552 provides: "This chapter shall provide *the sole and exclusive procedure* by which a local agency or school district may claim reimbursement for costs mandated by the state as required by Section 6 of Article XIII B of the California Constitution." (Italics added.)

In short, the Legislature has created what is clearly intended to be a comprehensive and exclusive procedure by which to implement and enforce section 6.

IV

EXCLUSIVITY

 Plaintiffs argued, and the Court of Appeal agreed, that the existence of an administrative remedy by which affected local agencies could enforce their right under section 6 to reimbursement for the cost of state mandates did not bar this action because the administrative remedy is available only to local agencies and school districts.

The Court of Appeal recognized that the decision of the County of Alameda, which had not filed a claim for reimbursement at the time the complaint was filed, was a discretionary decision which plaintiffs could not challenge. (*Dunn* v. *Long Beach L. & W. Co.* (1896) 114 Cal. 605, 609, 610-611 [46 P. 607]; *Silver* v. *Watson* (1972) 26 Cal.App.3d 905, 909 [103 Cal.Rptr. 576]; *Whitson* v. *City of Long Beach* (1962) 200 Cal.App.2d 486, 506 [19 Cal.Rptr. 668]; *Elliott* v. *Superior Court* (1960) 180 Cal.App.2d 894, 897 [5 Cal.Rptr. 116].) The court concluded, however, that public policy and practical necessity required that plaintiffs have a remedy for enforcement of section 6 independent of the statutory procedure.

The right involved, however, is a right given by the Constitution to local agencies, not individuals either as taxpayers or recipients of government benefits and services. Section 6 provides that the "state shall provide a subvention of funds *to reimburse . . . local governments . . . .*" (Italics added.) The administrative remedy created by the Legislature is adequate to fully implement section 6. That Alameda County did not file a reimbursement claim does not establish that the enforcement remedy is inadequate. Any of the 58 counties was free to file a claim, and other counties did so. The test claim is now before the Court of Appeal. The administrative procedure has operated as intended.

The Legislature has the authority to establish procedures for the implementation of local agency rights under section 6. Unless the exercise of a constitutional right is unduly restricted, the court must limit enforcement to the procedures established by the Legislature. (*People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 637 [268 P.2d 723]; *Chesney* v. *Byram* (1940) 15 Cal.2d 460, 463 [101 P.2d 1106]; *County of Contra Costa* v. *State of California* (1986) 177 Cal.App.3d 62, 75 [222 Cal.Rptr. 750].)

Plaintiffs' argument that they must be permitted to enforce section 6 as individuals because their right to adequate health care services has been compromised by the failure of the state to reimburse the county for the cost

of services to medically indigent adults is unpersuasive. Plaintiffs' interest, although pressing, is indirect and does not differ from the interest of the public at large in the financial plight of local government. Although the basis for the claim that the state must reimburse the county for its costs of providing the care that was formerly available to plaintiffs under Medi-Cal is that AB 799 created a state mandate, plaintiffs have no right to have any reimbursement expended for health care services of any kind. Nothing in article XIII B or other provision of law controls the county's expenditure of the funds plaintiffs claim must be paid to the county. To the contrary, section 17563 gives the local agency complete discretion in the expenditure of funds received pursuant to section 6, providing: "Any funds received by a local agency or school district pursuant to the provisions of this chapter may be used for any public purpose."

The relief plaintiffs seek in their prayer for state reimbursement of county expenses is, in the end, a reallocation of general revenues between the state and the county. Neither public policy nor practical necessity compels creation of a judicial remedy by which individuals may enforce the right of the county to such revenues. The Legislature has established a procedure by which the county may claim any revenues to which it believes it is entitled under section 6. That test-claim statute expressly provides that not only the claimant, but also "any other interested organization or individual may participate" in the hearing before the Commission (§ 17555) at which the right to reimbursement of the costs of such mandate is to be determined. Procedures for receiving any claims must "provide for presentation of evidence by the claimant, the Department of Finance and any other affected department or agency, *and any other interested person.*" (§ 17553. Italics added.) Neither the county nor an interested individual is without an opportunity to be heard on these questions. These procedures are both adequate and exclusive.[7]

The alternative relief plaintiffs seek—reinstatement to Medi-Cal pending further action by the state—is not a remedy available under the statute, and thus is not one which this court may award. The remedy for the failure to fund a program is a declaration that the mandate is unenforceable. That relief is available only after the Commission has determined that a mandate exists

[7]Plaintiffs' argument, that the Legislature's failure to make provision for individual enforcement of section 6 before the Commission demonstrates an intent to permit legal actions, is not persuasive. The legislative statement of intent to relegate all mandate disputes to the Commission is clear. A more likely explanation of the failure to provide for test cases to be initiated by individuals lies in recognition that (1) because section 6 creates rights only in governmental entities, individuals lack sufficient beneficial interest in either the receipt or expenditure of reimbursement funds to accord them standing; and (2) the number of local agencies having a direct interest in obtaining reimbursement is large enough to ensure that citizen interests will be adequately represented.

and the Legislature has failed to include the cost in a local government claims bill, and only on petition by the county. (§ 17612.)[8]

Moreover, the judicial remedy approved by the Court of Appeal permits resolution of the issues raised in a state mandate claim without the participation of those officers and individuals the Legislature deems necessary to a full and fair exposition and resolution of the issues. Neither the Controller nor the Director of Finance was named a defendant in this action. The Treasurer and the Director of the Office of Planning and Research did not participate. All of these officers would have been involved in determining the question as members of the Commission, as would the public member of the Commission. The judicial procedures were not equivalent to the public hearing required on test claims before the Commission by section 17555. Therefore, other affected departments, organizations, and individuals had no opportunity to be heard.[9]

Finally, since a determination that a state mandate has been created in a judicial proceeding rather than one before the Commission does not trigger the procedures for creating parameters and guidelines for payment of claims, or for inclusion of estimated costs in the state budget, there is no source of funds available for compliance with the judicial decision other than the appropriations for the Department of Health Services. Payment from those funds can only be at the expense of another program which the department is obligated to fund. No public policy supports, let alone requires, this result.

The superior court acted properly in dismissing this action.

The judgment of the Court of Appeal is reversed.

Lucas, C. J., Panelli, J., Kennard, J., and Arabian, J., concurred.

**BROUSSARD, J.**—I dissent. For nine years the Legislature has defied the mandate of article XIII B of the California Constitution (hereafter article XIII B). Having transferred responsibility for the care of medically indigent adults (MIA's) to county governments, the Legislature has failed to provide the counties with sufficient money to meet this responsibility, yet the

---

[8]Plaintiffs are not without a remedy if the county fails to provide adequate health care, however. They may enforce the obligation imposed on the county by Welfare and Institutions Code sections 17000 and 17001, and by judicial action. (See, e.g., *Mooney v. Pickett* (1971) 4 Cal.3d 669 [94 Cal.Rptr. 279, 483 P.2d 1231].)

[9]For this reason, it would be inappropriate to address the merits of plaintiff's claim in this proceeding. (Cf. *Dix v. Superior Court* (1991) 53 Cal.3d 442 [279 Cal.Rptr. 834, 807 P.2d 1063].) Unlike the dissent, we do not assume that in representing the state in this proceeding, the Attorney General necessarily represented the interests and views of these officials.

Legislature computes its own appropriations limit as if it fully funded the program. The majority, however, declines to remedy this violation because, it says, the persons most directly harmed by the violation—the medically indigent who are denied adequate health care—have no standing to raise the matter. I disagree, and will demonstrate that (1) plaintiffs have standing as citizens to seek a declaratory judgment to determine whether the state is complying with its constitutional duty under article XIII B; (2) the creation of an administrative remedy whereby counties and local districts can enforce article XIII B does not deprive the citizenry of its own independent right to enforce that provision; and (3) even if plaintiffs lacked standing, our recent decision in *Dix* v. *Superior Court* (1991) 53 Cal.3d 442 [279 Cal.Rptr. 834, 807 P.2d 1063] permits us to reach and resolve any significant issue decided by the Court of Appeal and fully briefed and argued here. I conclude that we should reach the merits of the appeal.

On the merits, I conclude that the state has not complied with its constitutional obligation under article XIII B. To prevent the state from avoiding the spending limits imposed by article XIII B, section 6 of that article prohibits the state from transferring previously state-financed programs to local governments without providing sufficient funds to meet those burdens. In 1982, however, the state excluded the medically indigent from its Medi-Cal program, thus shifting the responsibility for such care to the counties. Subvention funds provided by the state were inadequate to reimburse the counties for this responsibility, and became less adequate every year. At the same time, the state continued to compute its spending limit as if it fully financed the entire program. The result is exactly what article XIII B was intended to prevent: the state enjoys a falsely inflated spending limit; the county is compelled to assume a burden it cannot afford; and the medically indigent receive inadequate health care.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiffs—citizens, taxpayers, and persons in need of medical care—allege that the state has shifted its financial responsibility for the funding of health care for MIA's to the counties without providing the necessary funding and without any agreement transferring appropriation limits, and that as a result the state is violating article XIII B. Plaintiffs further allege they and the class they claim to represent cannot, consequently, obtain adequate health care from the County of Alameda, which lacks the state funding to provide it. The county, although nominally a defendant, aligned

itself with plaintiffs. It admits the inadequacy of its program to provide medical care for MIA's but blames the absence of state subvention funds.[1]

At hearings below, plaintiffs presented uncontradicted evidence regarding the enormous impact of these statutory changes upon the finances and population of Alameda County. That county now spends about $40 million annually on health care for MIA's, of which the state reimburses about half. Thus, since article XIII B became effective, Alameda County's obligation for the health care of MIA's has risen from zero to more than $20 million per year. The county has inadequate funds to discharge its new obligation for the health care of MIA's; as a result, according to the Court of Appeal, uncontested evidence from medical experts presented below shows that, "The delivery of health care to the indigent in Alameda County is in a state of shambles; the crisis cannot be overstated . . . ." "Because of inadequate state funding, some Alameda County residents are dying, and many others are suffering serious diseases and disabilities, because they cannot obtain adequate access to the medical care they need . . . ." "The system is clogged to the breaking point. . . . All community clinics . . . are turning away patients." "The funding received by the county from the state for MIAs does not approach the actual cost of providing health care to the MIAs. As a consequence, inadequate resources available to county health services jeopardize the lives and health of thousands of people . . . ."

The trial court acknowledged that plaintiffs had shown irreparable injury, but denied their request for a preliminary injunction on the ground that they could not prevail in the action. It then granted the state's motion for summary judgment. Plaintiffs appealed from both decisions of the trial court.

The Court of Appeal consolidated the two appeals and reversed the rulings below. It concluded that plaintiffs had standing to bring this action to enforce the constitutional spending limit of article XIII B, and that the action is not barred by the existence of administrative remedies available to counties. It then held that the shift of a portion of the cost of medical indigent care by the state to Alameda County constituted a state-mandated new program under the provisions of article XIII B, which triggered that article's provisions requiring a subvention of funds by the state to reimburse Alameda

---

[1]The majority states that "Plaintiffs are not without a remedy if the county fails to provide adequate health care . . . . They may enforce the obligation imposed on the county by Welfare and Institutions Code sections 17000 and 17001, and by judicial action." (Maj. opn., *ante*, p. 336, fn. 8)

The majority fails to note that plaintiffs have already tried this remedy, and met with the response that, owing to the state's inadequate subvention funds, the county cannot afford to provide adequate health care.

County for the costs of such program it was required to assume. The judgments denying a preliminary injunction and granting summary judgment for defendants were reversed. We granted review.

## II. STANDING

A. *Plaintiffs have standing to bring an action for declaratory relief to determine whether the state is complying with article XIII B.*

Plaintiffs first claim standing as taxpayers under Code of Civil Procedure section 526a, which provides that: "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county . . . , may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein. . . ." As in *Common Cause* v. *Board of Supervisors* (1989) 49 Cal.3d 432, 439 [261 Cal.Rptr. 574, 777 P.2d 610], however, it is "unnecessary to reach the question whether plaintiffs have standing to seek an injunction under Code of Civil Procedure section 526a, because there is an independent basis for permitting them to proceed." Plaintiffs here seek a declaratory judgment that the transfer of responsibility for MIA's from the state to the counties without adequate reimbursement violates article XIII B. A declaratory judgment that the state has breached its duty is essentially equivalent to an action in mandate to compel the state to perform its duty. (See *California Assn. of Psychology Providers* v. *Rank* (1990) 51 Cal.3d 1, 9 [270 Cal.Rptr. 796, 793 P.2d 2], which said that a declaratory judgment establishing that the state has a duty to act provides relief equivalent to mandamus, and makes issuance of the writ unnecessary.) Plaintiffs further seek a mandatory injunction requiring that the state pay the health costs of MIA's under the Medi-Cal program until the state meets its obligations under article XIII B. The majority similarly characterize plaintiffs' action as one comparable to mandamus brought to enforce section 6 of article XIII B.

We should therefore look for guidance to cases that discuss the standing of a party seeking a writ of mandate to compel a public official to perform his or her duty.[2] Such an action may be brought by any person "beneficially interested" in the issuance of the writ. (Code Civ. Proc., § 1086.) In *Carsten*

[2]It is of no importance that plaintiffs did not request issuance of a writ of mandate. In *Taschner* v. *City Council* (1973) 31 Cal.App.3d 48, 56 [107 Cal.Rptr. 214] (overruled on other grounds in *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 596 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]), the court said that "[a]s against a

v. *Psychology Examining Com.* (1980) 27 Cal.3d 793, 796 [166 Cal.Rptr. 844, 614 P.2d 276], we explained that the "requirement that a petitioner be 'beneficially interested' has been generally interpreted to mean that one may obtain the writ only if the person has some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large." We quoted from Professor Davis, who said, "One who is in fact adversely affected by governmental action should have standing to challenge that action if it is judicially reviewable." (Pp. 796-797, quoting 3 Davis, Administrative Law Treatise (1st ed. 1958) p. 291.) Cases applying this standard include *Stocks* v. *City of Irvine* (1981) 114 Cal.App.3d 520 [170 Cal.Rptr. 724], which held that low-income residents of Los Angeles had standing to challenge exclusionary zoning laws of suburban communities which prevented the plaintiffs from moving there; *Taschner* v. *City Council, supra,* 31 Cal.App.3d 48, which held that a property owner has standing to challenge an ordinance which may limit development of the owner's property; and *Felt* v. *Waughop* (1924) 193 Cal. 498 [225 P. 862], which held that a city voter has standing to compel the city clerk to certify a correct list of candidates for municipal office. Other cases illustrate the limitation on standing: *Carsten* v. *Psychology Examining Com., supra,* 27 Cal.3d 793, held that a member of the committee who was neither seeking a license nor in danger of losing one had no standing to challenge a change in the method of computing the passing score on the licensing examination; *Parker* v. *Bowron* (1953) 40 Cal.2d 344 [254 P.2d 6] held that a union official who was neither a city employee nor a city resident had no standing to compel a city to follow a prevailing wage ordinance; and *Dunbar* v. *Governing Board* (1969) 275 Cal.App.2d 14 [79 Cal.Rptr. 662] held that a member of a student organization had standing to challenge a college district's rule barring a speaker from campus, but persons who merely planned to hear him speak did not.

No one questions that plaintiffs are affected by the lack of funds to provide care for MIA's. Plaintiffs, except for plaintiff Rabinowitz, are not merely citizens and taxpayers; they are medically indigent persons living in Alameda County who have been and will be deprived of proper medical care if funding of MIA programs is inadequate. Like the other plaintiffs here,

---

general demurrer, a complaint for declaratory relief may be treated as a petition for mandate [citations], and where a complaint for declaratory relief alleges facts sufficient to entitle plaintiff to mandate, it is error to sustain a general demurrer without leave to amend."

In the present case, the trial court ruled on a motion for summary judgment, but based that ruling not on the evidentiary record (which supported plaintiffs' showing of irreparable injury) but on the issues as framed by the pleadings. This is essentially equivalent to a ruling on demurrer, and a judgment denying standing could not be sustained on the narrow ground that plaintiffs asked for the wrong form of relief without giving them an opportunity to correct the defect. (See *Residents of Beverly Glen, Inc.* v. *City of Los Angeles* (1973) 34 Cal.App.3d 117, 127-128 [109 Cal.Rptr. 724].)

plaintiff Kinlaw, a 60-year-old woman with diabetes and hypertension, has no health insurance. Plaintiff Spier has a chronic back condition; inadequate funding has prevented him from obtaining necessary diagnostic procedures and physiotherapy. Plaintiff Tsosie requires medication for allergies and arthritis, and claims that because of inadequate funding she cannot obtain proper treatment. Plaintiff King, an epileptic, says she was unable to obtain medication from county clinics, suffered seizures, and had to go to a hospital. Plaintiff "Doe" asserts that when he tried to obtain treatment for AIDS-related symptoms, he had to wait four to five hours for an appointment and each time was seen by a different doctor. All of these are people personally dependent upon the quality of care of Alameda County's MIA program; most have experienced inadequate care because the program was underfunded, and all can anticipate future deficiencies in care if the state continues its refusal to fund the program fully.

The majority, however, argues that the county has no duty to use additional subvention funds for the care of MIA's because under Government Code section 17563 "[a]ny funds received by a local agency . . . pursuant to the provisions of this chapter may be used for any public purpose." Since the county may use the funds for other purposes, it concludes that MIA's have no special interest in the subvention.[3]

This argument would be sound if the county were already meeting its obligations to MIA's under Welfare and Institutions Code section 17000. If that were the case, the county could use the subvention funds as it chose, and plaintiffs would have no more interest in the matter than any other county resident or taxpayer. But such is not the case at bar. Plaintiffs here allege that the county is not complying with its duty, mandated by Welfare and Institutions Code section 17000, to provide health care for the medically indigent; the county admits its failure but pleads lack of funds. Once the county receives adequate funds, it must perform its statutory duty under section 17000 of the Welfare and Institutions Code. If it refused, an action in mandamus would lie to compel performance. (See *Mooney* v. *Pickett* (1971) 4 Cal.3d 669 [94 Cal.Rptr. 279, 483 P.2d 1231].) In fact, the county has made clear throughout this litigation that it would use the subvention funds to provide care for MIA's. The majority's conclusion that plaintiffs lack a special, beneficial interest in the state's compliance with article XIII B ignores the practical realities of health care funding.

Moreover, we have recognized an exception to the rule that a plaintiff must be beneficially interested. "Where the question is one of public right

---

[3]The majority's argument assumes that the state will comply with a judgment for plaintiffs by providing increased subvention funds. If the state were instead to comply by restoring Medi-Cal coverage for MIA's, or some other method of taking responsibility for their health needs, plaintiffs would benefit directly.

and the object of the mandamus is to procure the enforcement of a public duty, the relator need not show that he has any legal or special interest in the result, since it is sufficient that he is interested as a citizen in having the laws executed and the duty in question enforced." (*Bd. of Soc. Welfare* v. *County of L. A.* (1945) 27 Cal.2d 98, 100-101 [162 P.2d 627].) We explained in *Green* v. *Obledo* (1981) 29 Cal.3d 126, 144 [172 Cal.Rptr. 206, 624 P.2d 256], that this "exception promotes the policy of guaranteeing citizens the opportunity to ensure that no governmental body impairs or defeats the purpose of legislation establishing a public right. . . . It has often been invoked by California courts. [Citations.]"

*Green* v. *Obledo* presents a close analogy to the present case. Plaintiffs there filed suit to challenge whether a state welfare regulation limiting deductibility of work-related expenses in determining eligibility for aid to families with dependent children (AFDC) assistance complied with federal requirements. Defendants claimed that plaintiffs were personally affected only by a portion of the regulation, and had no standing to challenge the balance of the regulation. We replied that "[t]here can be no question that the proper calculation of AFDC benefits is a matter of public right [citation], and plaintiffs herein are certainly citizens seeking to procure the enforcement of a public duty. [Citation.] It follows that plaintiffs have standing to seek a writ of mandate commanding defendants to cease enforcing [the regulation] in its entirety." (29 Cal.3d at p. 145.)

We again invoked the exception to the requirement for a beneficial interest in *Common Cause* v. *Board of Supervisors, supra,* 49 Cal.3d 432. Plaintiffs in that case sought to compel the county to deputize employees to register voters. We quoted *Green* v. *Obledo, supra,* 29 Cal.3d 126, 144, and concluded that "[t]he question in this case involves a public right to voter outreach programs, and plaintiffs have standing as citizens to seek its vindication." (49 Cal.3d at p. 439.) We should reach the same conclusion here.

B. *Government Code sections 17500-17630 do not create an exclusive remedy which bars citizen-plaintiffs from enforcing article XIII B.*

Four years after the enactment of article XIII B, the Legislature enacted Government Code sections 17500 through 17630 to implement article XIII B, section 6. These statutes create a quasi-judicial body called the Commission on State Mandates, consisting of the state Controller, state Treasurer, state Director of Finance, state Director of the Office of Planning and Research, and one public member. The commission has authority to "hear and decide upon [any] claim" by a local government that it "is entitled to be reimbursed by the state" for costs under article XIII B. (Gov. Code, § 17551,

subd. (a).) Its decisions are subject to review by an action for administrative mandamus in the superior court. (See Gov. Code, § 17559.)

The majority maintains that a proceeding before the Commission on State Mandates is the exclusive means for enforcement of article XIII B, and since that remedy is expressly limited to claims by local agencies or school districts (Gov. Code, § 17552), plaintiffs lack standing to enforce the constitutional provision.[4] I disagree, for two reasons.

First, Government Code section 17552 expressly addressed the question of exclusivity of remedy, and provided that "[t]his chapter shall provide the sole and exclusive procedure by which *a local agency or school district* may claim reimbursement for costs mandated by the state as required by Section 6 of Article XIII B of the California Constitution." (Italics added.) The Legislature was aware that local agencies and school districts were not the only parties concerned with state mandates, for in Government Code section 17555 it provided that "any other interested organization or individual may participate" in the commission hearing. Under these circumstances the Legislature's choice of words—"the sole and exclusive procedure by which a local agency or school district may claim reimbursement"—limits the procedural rights of those claimants only, and does not affect rights of other persons. *Expressio unius est exclusio alterius*—"the expression of certain things in a statute necessarily involves exclusion of other things not expressed." (*Henderson* v. *Mann Theatres Corp.* (1976) 65 Cal.App.3d 397, 403 [135 Cal.Rptr. 266].)

The case is similar in this respect to *Common Cause* v. *Board of Supervisors, supra,* 49 Cal.3d 432. Here defendants contend that the counties' right of action under Government Code sections 17551-17552 impliedly excludes

---

[4]The majority emphasizes the statement of purpose of Government Code section 17500: "The Legislature finds and declares that the existing system for reimbursing local agencies and school districts for the costs of state-mandated local programs has not provided for the effective determination of the state's responsibilities under section 6 of article XIII B of the California Constitution. The Legislature finds and declares that the failure of the existing process to adequately and consistently resolve the complex legal questions involved in the determination of state-mandated costs has led to an increasing reliance by local agencies and school districts on the judiciary, and, therefore, in order to relieve unnecessary congestion of the judicial system, it is necessary to create a mechanism which is capable of rendering sound quasi-judicial decisions and providing an effective means of resolving disputes over the existence of state-mandated local programs."

The "existing system" to which Government Code section 17500 referred was the Property Tax Relief Act of 1972 (Rev. & Tax. Code, §§ 2201-2327), which authorized local agencies and school boards to request reimbursement from the state Controller. Apparently dissatisfied with this remedy, the agencies and boards were bypassing the Controller and bringing actions directly in the courts. (See, e.g., *County of Contra Costa* v. *State of California* (1986) 177 Cal.App.3d 62 [222 Cal.Rptr. 750].) The legislative declaration refers to this phenomenon. It does not discuss suits by individuals.

any citizen's remedy; in *Common Cause* defendants claimed the Attorney General's right of action under Elections Code section 304 impliedly excluded any citizen's remedy. We replied that "the plain language of section 304 contains no limitation on the right of private citizens to sue to enforce the section. To infer such a limitation would contradict our long-standing approval of citizen actions to require governmental officials to follow the law, expressed in our expansive interpretation of taxpayer standing [citations], and our recognition of a 'public interest' exception to the requirement that a petitioner for writ of mandate have a personal beneficial interest in the proceedings [citations]." (49 Cal.3d at p. 440, fn. omitted.) Likewise in this case the plain language of Government Code sections 17551-17552 contain no limitation on the right of private citizens, and to infer such a right would contradict our long-standing approval of citizen actions to enforce public duties.

The United States Supreme Court reached a similar conclusion in *Rosado* v. *Wyman* (1970) 397 U.S. 397 [25 L.Ed.2d 442, 90 S.Ct. 1207]. In that case New York welfare recipients sought a ruling that New York had violated federal law by failing to make cost-of-living adjustments to welfare grants. The state replied that the statute giving the Department of Health, Education and Welfare authority to cut off federal funds to noncomplying states constituted an exclusive remedy. The court rejected the contention, saying that "[w]e are most reluctant to assume Congress has closed the avenue of effective judicial review to those individuals most directly affected by the administration of its program." (P. 420 [25 L.Ed.2d at p. 460].) The principle is clear: the persons actually harmed by illegal state action, not only some administrator who has no personal stake in the matter, should have standing to challenge that action.

Second, article XIII B was enacted to protect taxpayers, not governments. Sections 1 and 2 of article XIII B establish strict limits on state and local expenditures, and require the refund of all taxes collected in excess of those limits. Section 6 of article XIII B prevents the state from evading those limits and burdening county taxpayers by transferring financial responsibility for a program to a county, yet counting the cost of that program toward the limit on state expenditures.

These provisions demonstrate a profound distrust of government and a disdain for excessive government spending. An exclusive remedy under which only governments can enforce article XIII B, and the taxpayer-citizen can appear only if a government has first instituted proceedings, is inconsistent with the ethos that led to article XIII B. The drafters of article XIII B and the voters who enacted it would not accept that the state Legislature—the principal body regulated by the article—could establish a procedure

under which the only way the article can be enforced is for local governmental bodies to initiate proceedings before a commission composed largely of state financial officials.

One obvious reason is that in the never-ending attempts of state and local government to obtain a larger proportionate share of available tax revenues, the state has the power to coerce local governments into forgoing their rights to enforce article XIII B. An example is the Brown-Presley Trial Court Funding Act (Gov. Code, § 77000 et seq.), which provides that the county's acceptance of funds for court financing may, in the discretion of the Governor, be deemed a waiver of the counties' rights to proceed before the commission on all claims for reimbursement for state-mandated local programs which existed and were not filed prior to passage of the trial funding legislation.[5] The ability of state government by financial threat or inducement to persuade counties to waive their right of action before the commission renders the counties' right of action inadequate to protect the public interest in the enforcement of article XIII B.

The facts of the present litigation also demonstrate the inadequacy of the commission remedy. The state began transferring financial responsibility for MIA's to the counties in 1982. Six years later no county had brought a proceeding before the commission. After the present suit was filed, two counties filed claims for 70 percent reimbursement. Now, nine years after the 1982 legislation, the counties' claims are pending before the Court of Appeal. After that court acts, and we decide whether to review its decision, the matter may still have to go back to the commission for hearings to

---

[5]"(a) The initial decision by a county to opt into the system pursuant to Section 77300 *shall constitute a waiver of all claims for reimbursement for state-mandated local programs not thereofore approved by the State Board of Control, the Commission on State Mandates, or the courts to the extent the Governor, in his discretion, determines that waiver to be appropriate*; provided, that a decision by a county to opt into the system pursuant to Section 77300 beginning with the second half of the 1988-89 fiscal year shall not constitute a waiver of a claim for reimbursement based on a statute chaptered on or before the date the act which added this chapter is chaptered, which is filed in acceptable form on or before the date the act which added this chapter is chaptered. A county may petition the Governor to exempt any such claim from this waiver requirement; and the Governor, in his discretion, may grant the exemption in whole or in part. The waiver shall not apply to or otherwise affect any claims accruing after initial notification. Renewal, renegotiation, or subsequent notification to continue in the program shall not constitute a waiver. [¶] (b) The initial decision by a county to opt into the system pursuant to Section 77300 shall constitute a waiver of any claim, cause of action, or action whenever filed, with respect to the Trial Court Funding Act of 1985, Chapter 1607 of the Statutes of 1985, or Chapter 1211 of the Statutes of 1987." (Gov. Code, § 77203.5, italics added.)

"As used in this chapter, 'state-mandated local program' *means any and all reimbursements owed or owing by operation of either Section 6 of Article XIII B of the California Constitution*, or Section 17561 of the Government Code, or both." (Gov. Code, § 77005, italics added.)

determine the amount of the mandate—which is itself an appealable order. When an issue involves the life and health of thousands, a procedure which permits this kind of delay is not an adequate remedy.

In sum, effective, efficient enforcement of article XIII B requires that standing to enforce that measure be given to those harmed by its violation —in this case, the medically indigent—and not be vested exclusively in local officials who have no personal interest at stake and are subject to financial and political pressure to overlook violations.

> C. *Even if plaintiffs lack standing this court should nevertheless address and resolve the merits of the appeal.*

Although ordinarily a court will not decide the merits of a controversy if the plaintiffs lack standing (see *McKinny* v. *Board of Trustees* (1982) 31 Cal.3d 79, 90 [181 Cal.Rptr. 549, 642 P.2d 460]), we recognized an exception to this rule in our recent decision in *Dix* v. *Superior Court, supra,* 53 Cal.3d 442 (hereafter *Dix*). In *Dix*, the victim of a crime sought to challenge the trial court's decision to recall a sentence under Penal Code section 1170. We held that only the prosecutor, not the victim of the crime, had standing to raise that issue. We nevertheless went on to consider and decide questions raised by the victim concerning the trial court's authority to recall a sentence under Penal Code section 1170, subdivision (d). We explained that the sentencing issues "are significant. The case is fully briefed and all parties apparently seek a decision on the merits. Under such circumstances, we deem it appropriate to address [the victim's] sentencing arguments for the guidance of the lower courts. Our discretion to do so under analogous circumstances is well settled. [Citing cases explaining when an appellate court can decide an issue despite mootness.]" (53 Cal.3d at p. 454.) In footnote we added that "Under article VI, section 12, subdivision (b) of the California Constitution . . . , we have jurisdiction to 'review the *decision of a Court of Appeal* in any cause.' (Italics added.) Here the Court of Appeal's decision addressed two issues—standing and merits. Nothing in article VI, section 12(b) suggests that, having rejected the Court of Appeal's conclusion on the preliminary issue of standing, we are foreclosed from 'review[ing]' the second subject addressed and resolved in its decision." (Pp. 454-455, fn. 8.)

I see no grounds on which to distinguish *Dix*. The present case is also one in which the Court of Appeal decision addressed both standing and merits. It is fully briefed. Plaintiffs and the county seek a decision on the merits. While the state does not seek a decision on the merits in this proceeding, its appeal of the superior court decision in the mandamus proceeding brought by the County of Los Angeles (see maj. opn., *ante,* p. 330, fn. 2) shows that it is not opposed to an appellate decision on the merits.

The majority, however, notes that various state officials—the Controller, the Director of Finance, the Treasurer, and the Director of the Office of Planning and Research—did not participate in this litigation. Then in a footnote, the majority suggests that this is the reason they do not follow the *Dix* decision. (Maj. opn., *ante*, p. 336, fn. 9.) In my view, this explanation is insufficient. The present action is one for declaratory relief against the state. It is not necessary that plaintiffs also sue particular state officials. (The state has never claimed that such officials were necessary parties.) I do not believe we should refuse to reach the merits of this appeal because of the nonparticipation of persons who, if they sought to participate, would be here merely as amici curiae.[6]

The case before us raises no issues of departmental policy. It presents solely an issue of law which this court is competent to decide on the briefs and arguments presented. That issue is one of great significance, far more significant than any raised in *Dix*. Judges rarely recall sentencing under Penal Code section 1170, subdivision (d); when they do, it generally affects only the individual defendant. In contrast, the legal issue here involves immense sums of money and affect budgetary planning for both the state and counties. State and county governments need to know, as soon as possible, what their rights and obligations are; legislators considering proposals to deal with the current state and county budget crisis need to know how to frame legislation so it does not violate article XIII B. The practical impact of a decision on the people of this state is also of great importance. The failure of the state to provide full subvention funds and the difficulty of the county in filling the gap translate into inadequate staffing and facilities for treatment of thousands of persons. Until the constitutional issues are resolved the legal uncertainties may inhibit both levels of government from taking the steps needed to address this problem. A delay of several years until the Los Angeles case is resolved could result in pain, hardship, or even death for many people. I conclude that, whether or not plaintiffs have standing, this court should address and resolve the merits of the appeal.

### D. *Conclusion as to standing.*

As I have just explained, it is not necessary for plaintiffs to have standing for us to be able to decide the merits of the appeal. Nevertheless, I conclude

---

[6]It is true that these officials would participate in a proceeding before the Commission on State Mandates, but they would do so as members of an administrative tribunal. On appellate review of a commission decision, its members, like the members of the Public Utilities Commission or the Workers' Compensation Appeals Board, are not respondents and do not appear to present their individual views and positions. For example, in *Lucia Mar Unified School Dist.* v. *Honig* (1988) 44 Cal.3d 830 [244 Cal.Rptr. 677, 750 P.2d 318], in which we reviewed a commission ruling relating to subvention payments for education of handicapped children, the named respondents were the state Superintendent of Public Instruction, the Department of Education, and the Commission on State Mandates. The individual members of the commission were not respondents and did not participate.

that plaintiffs have standing both as persons "beneficially interested" under Code of Civil Procedure section 1086 and under the doctrine of *Green* v. *Obledo, supra,* 29 Cal.3d 126, to bring an action to determine whether the state has violated its duties under article XIII B. The remedy given local agencies and school districts by Government Code sections 17500-17630 is, as Government Code section 17552 states, the exclusive remedy by which those bodies can challenge the state's refusal to provide subvention funds, but the statute does not limit the remedies available to individual citizens.

III. MERITS OF THE APPEAL

A. *State funding of care for MIA's.*

Welfare and Institutions Code section 17000 requires every county to "relieve and support" all indigent or incapacitated residents, except to the extent that such persons are supported or relieved by other sources.[7] From 1971 until 1982, and thus at the time article XIII B became effective, counties were not required to pay for the provision of health services to MIA's, whose health needs were met through the state-funded Medi-Cal program. Since the medical needs of MIA's were fully met through other sources, the counties had no duty under Welfare and Institutions Code section 17000 to meet those needs. While the counties did make general contributions to the Medi-Cal program (which covered persons other than MIA's) from 1971 until 1978, at the time article XIII B became effective in 1980 the counties were not required to make any financial contributions to Medi-Cal. It is therefore undisputed that the counties were not required to provide financially for the health needs of MIA's when article XIII B became effective. The state funded all such needs of MIA's.

In 1982, the Legislature passed Assembly Bill No. 799 (1981-1982 Reg. Sess.; Stats. 1982, ch. 328, pp. 1568-1609) (hereafter AB No. 799), which removed MIA's from the state-funded Medi-Cal program as of January 1, 1983, and thereby transferred to the counties, through the County Medical Services Plan which AB No. 799 created, the financial responsibility to provide health services to approximately 270,000 MIA's. AB No. 799 required that the counties provide health care for MIA's, yet appropriated only 70 percent of what the state would have spent on MIA's had those persons remained a state responsibility under the Medi-Cal program.

Since 1983, the state has only partially defrayed the costs to the counties of providing health care to MIA's. Such state funding to counties was

---

[7]Welfare and Institutions Code section 17000 provides that "[e]very county . . . shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions."

initially relatively constant, generally more than $400 million per year. By 1990, however, state funding had decreased to less than $250 million. The state, however, has always included the full amount of its former obligation to provide for MIA's under the Medi-Cal program in the year preceding July 1, 1980, as part of its article XIII B "appropriations limit," i.e., as part of the base amount of appropriations on which subsequent annual adjustments for cost-of-living and population changes would be calculated. About $1 billion has been added to the state's adjusted spending limit for population growth and inflation *solely* because of the state's inclusion of all MIA expenditures in the appropriation limit established for its base year, 1979-1980. The state has not made proportional increases in the sums provided to counties to pay for the MIA services funded by the counties since January 1, 1983.

B. *The function of article XIII B.*

Our recent decision in *County of Fresno* v. *State of California* (1991) 53 Cal.3d 482, 486-487 [280 Cal.Rptr. 92, 808 P.2d 235] (hereafter *County of Fresno*), explained the function of article XIII B and its relationship to article XIII A, enacted one year earlier:

"At the June 6, 1978, Primary Election, article XIII A was added to the Constitution through the adoption of Proposition 13, an initiative measure aimed at controlling ad valorem property taxes and the imposition of new 'special taxes.' (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 231-232 [149 Cal.Rptr. 239, 583 P.2d 1281].) The constitutional provision imposes a limit on the power of state and local governments to adopt and levy taxes. (*City of Sacramento* v. *State of California* (1990) 50 Cal.3d 51, 59, fn. 1 [266 Cal.Rptr. 139, 785 P.2d 522] (*City of Sacramento*).)

"At the November 6, 1979, Special Statewide Election, article XIII B was added to the Constitution through the adoption of Proposition 4, another initiative measure. That measure places limitations on the ability of both state and local governments to appropriate funds for expenditures.

" 'Articles XIII A and XIII B work in tandem, together restricting California governments' power both to levy and to spend [taxes] for public purposes.' (*City of Sacramento, supra*, 50 Cal.3d at p. 59, fn. 1.)

"Article XIII B of the Constitution was intended . . . to provide 'permanent protection for taxpayers from excessive taxation' and 'a reasonable way to provide discipline in tax spending at state and local levels.' (See *County of Placer* v. *Corin* (1980) 113 Cal.App.3d 443, 446 [170 Cal.Rptr. 232], quoting and following Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Special Statewide Elec. (Nov. 6, 1979), argument

in favor of Prop. 4, p. 18.) To this end, it establishes an 'appropriations limit' for both state and local governments (Cal. Const., art. XIII B, § 8, subd. (h)) and allows no 'appropriations subject to limitation' in excess thereof (*id.,* § 2).[8] (See *County of Placer* v. *Corin, supra,* 113 Cal.App.3d at p. 446.) It defines the relevant 'appropriations subject to limitation' as 'any authorization to expend during a fiscal year the proceeds of taxes . . . .' (Cal. Const., art. XIII B, § 8, subd. (b).)" (*County of Fresno, supra,* 53 Cal.3d at p. 486.)

Under section 3 of article XIII B the state may transfer financial responsibility for a program to a county if the state and county mutually agree that the appropriation limit of the state will be decreased and that of the county increased by the same amount.[9] Absent such an agreement, however, section 6 of article XIII B generally precludes the state from avoiding the spending limits it must observe by shifting to local governments programs and their attendant financial burdens which were a state responsibility prior to the effective date of article XIII B. It does so by requiring that "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the state shall provide a subvention of funds to reimburse such local government for the cost of such program or increased level of service . . . ."[10]

"Section 6 was included in article XIII B in recognition that article XIII A of the Constitution severely restricted the taxing powers of local governments. (See *County of Los Angeles* [v. *State of California* (1987)] 43 Cal.3d 46, 61 [233 Cal.Rptr. 38, 729 P.2d 202].) The provision was intended to preclude the state from shifting financial responsibility for carrying out governmental functions onto local entities that were ill equipped to handle the task. (*Ibid.*; see *Lucia Mar Unified School Dist.* v. *Honig, supra,* 44 Cal.3d 830, 836, fn. 6.) Specifically, it was designed to protect the tax

---

[8]Article XIII B, section 1 provides: "The total annual appropriations subject to limitation of the state and of each local government shall not exceed the appropriations limit of such entity of government for the prior year adjusted for changes in the cost of living and population except as otherwise provided in this Article."

[9]Section 3 of article XIII B reads in relevant part: "The appropriations limit for any fiscal year . . . shall be adjusted as follows:

"(a) In the event that the financial responsibility of providing services is transferred, in whole or in part . . . from one entity of government to another, then for the year in which such transfer becomes effective the appropriation limit of the transferee entity shall be increased by such reasonable amount as the said entities shall mutually agree and the appropriations limit of the transferor entity shall be decreased by the same amount. . . ."

[10]Section 6 of article XIII B further provides that the "Legislature may, but need not, provide such subvention of funds for the following mandates: (a) Legislative mandates requested by the local agency affected; (b) Legislation defining a new crime or changing an existing definition of a crime; or (c) Legislative mandates enacted prior to January 1, 1975, or executive orders or regulations initially implementing legislation enacted prior to January 1, 1975." None of these exceptions apply in the present case.

revenues of local governments from state mandates that would require expenditure of such revenues." (*County of Fresno, supra,* 53 Cal.3d at p. 487.)

### C. *Applicability of article XIII B to health care for MIA's.*

The state argues that care of the indigent, including medical care, has long been a county responsibility. It claims that although the state undertook to fund this responsibility from 1979 through 1982, it was merely temporarily (as it turned out) helping the counties meet their responsibilities, and that the subsequent reduction in state funding did not impose any "new program" or "higher level of service" on the counties within the meaning of section 6 of article XIII B. Plaintiffs respond that the critical question is not the traditional roles of the county and state, but who had the fiscal responsibility on November 6, 1979, when article XIII B took effect. The purpose of article XIII B supports the plaintiffs' position.

As we have noted, article XIII A of the Constitution (Proposition 13) and article XIII B are complementary measures. The former radically reduced county revenues, which led the state to assume responsibility for programs previously financed by the counties. Article XIII B, enacted one year later, froze both state and county appropriations at the level of the 1978-1979 budgets—a year when the budgets included state financing for the prior county programs, but not county financing for these programs. Article XIII B further limited the state's authority to transfer obligations to the counties. Reading the two together, it seems clear that article XIII B was intended to limit the power of the Legislature to retransfer to the counties those obligations which the state had assumed in the wake of Proposition 13.

Under article XIII B, both state and county appropriations limits are set on the basis of a calculation that begins with the budgets in effect when article XIII B was enacted. If the state could transfer to the county a program for which the state at that time had full financial responsibility, the county could be forced to assume additional financial obligations without the right to appropriate additional moneys. The state, at the same time, would get credit toward its appropriations limit for expenditures it did not pay. County taxpayers would be forced to accept new taxes or see the county forced to cut existing programs further; state taxpayers would discover that the state, by counting expenditures it did not pay, had acquired an actual revenue surplus while avoiding its obligation to refund revenues in excess of the appropriations limit. Such consequences are inconsistent with the purpose of article XIII B.

Our decisions interpreting article XIII B demonstrate that the state's subvention requirement under section 6 is not vitiated simply because the

"program" existed before the effective date of article XIII B. The alternate phrase of section 6 of article XIII B, " 'higher level of service[,]' . . . must be read in conjunction with the predecessor phrase 'new program' to give it meaning. Thus read, it is apparent that *the subvention requirement for increased or higher level of service is directed to state mandated increases in the services provided by local agencies in existing 'programs.'* " (*County of Los Angeles v. State of California* (1987) 43 Cal.3d 46, 56 [233 Cal.Rptr. 38, 729 P.2d 202], italics added.)

*Lucia Mar Unified School Dist.* v. *Honig, supra,* 44 Cal.3d 830, presents a close analogy to the present case. The state Department of Education operated schools for severely handicapped students, but prior to 1979 *school districts were required by statute to contribute* to education of those students from the district at the state schools. In 1979, in response to the restrictions on school district revenues imposed by Proposition 13, the statutes requiring such district contributions were repealed and the state assumed full responsibility for funding. The state funding responsibility continued until June 28, 1981, when Education Code section 59300 (hereafter section 59300), requiring school districts to share in these costs, became effective.

The plaintiff districts filed a test claim before the commission, contending they were entitled to state reimbursement under section 6 of article XIII B. The commission found the plaintiffs were not entitled to state reimbursement, on the rationale that the increase in costs to the districts compelled by section 59300 imposed no new program or higher level of services. The trial and intermediate appellate courts affirmed on the ground that section 59300 called for only an " 'adjustment of costs' " of educating the severely handicapped, and that "*a shift in the funding of an existing program is not a new program or a higher level of service*" within the meaning of article XIII B. (*Lucia Mar Unified School Dist.* v. *Honig, supra,* 44 Cal.3d at p. 834, italics added.)

We reversed, rejecting the state's theories that the funding shift to the county of the subject program's costs does not constitute a new program. "[There can be no] doubt that although the schools for the handicapped have been operated by the state for many years, the program was new insofar as plaintiffs are concerned, since *at the time section 59300 became effective* they were not required to contribute to the education of students from their districts at such schools. [¶] . . . To hold, under the circumstances of this case, that a shift in funding of an existing program from the state to a local entity is not a new program as to the local agency would, we think, violate the intent underlying section 6 of article XIIIB. That article imposed spending limits on state and local governments, and it followed by one year the adoption by initiative of article XIIIA, which severely limited the taxing

power of local governments. . . . [¶] The intent of the section would plainly be violated if the state could, while retaining administrative control[11] of programs it has supported with state tax money, simply shift the cost of the programs to local government on the theory that the shift does not violate section 6 of article XIIIB because the programs are not 'new.' Whether the shifting of costs is accomplished by compelling local governments to pay the cost of entirely new programs created by the state, *or by compelling them to accept financial responsibility in whole or in part for a program which was funded entirely by the state before the advent of article XIIIB, the result seems equally violative of the fundamental purpose underlying section 6 of that article.*" (*Lucia Mar Unified School Dist.* v. *Honig, supra,* 44 Cal.3d at pp. 835-836, fn. omitted, italics added.)

The state seeks to distinguish *Lucia Mar* on the ground that the education of handicapped children in state schools had never been the responsibility of the local school district, but overlooks that the local district had previously been required to contribute to the cost. Indeed the similarities between *Lucia Mar* and the present case are striking. In *Lucia Mar*, prior to 1979 the state and county shared the cost of educating handicapped children in state schools; in the present case from 1971-1979 the state and county shared the cost of caring for MIA's under the Medi-Cal program. In 1979, following enactment of Proposition 13, the state took full responsibility for both programs. Then in 1981 (for handicapped children) and 1982 (for MIA's), the state sought to shift some of the burden back to the counties. To distinguish these cases on the ground that care for MIA's is a county program but education of handicapped children a state program is to rely on arbitrary labels in place of financial realities.

The state presents a similar argument when it points to the following emphasized language from *Lucia Mar Unified School Dist.* v. *Honig, supra,* 44 Cal.3d 830: "[B]ecause section 59300 shifts partial financial responsibility for the support of students in the state-operated schools from the state to school districts—*an obligation the school districts did not have at the time article XIII B was adopted*—it calls for plaintiffs to support a 'new program' within the meaning of section 6." (P. 836, fn. omitted, italics added.) It urges *Lucia Mar* reached its result *only* because the "program" requiring school district funding in that case *was not required by statute* at the effective date of

---

[11]The state notes that, in contrast to the program at issue in *Lucia Mar*, it has not retained administrative control over aid to MIA's. But the quoted language from *Lucia Mar*, while appropriate to the facts of that case, was not intended to establish a rule limiting article XIII B, section 6, to instances in which the state retains administrative control over the program that it requires the counties to fund. The constitutional language admits of no such limitation, and its recognition would permit the Legislature to evade the constitutional requirement.

article XIII B. The state then argues that the case at bench is distinguishable because it contends Alameda County had a continuing obligation *required by statute* antedating that effective date, which had only been "temporarily"[12] suspended when article XIII B became effective. I fail to see the distinction between a case—*Lucia Mar*—in which no existing statute as of 1979 imposed an obligation on the local government and one—this case—in which the statute existing in 1979 imposed no obligation on local government.

The state's argument misses the salient point. As I have explained, the application of section 6 of article XIII B does not depend upon when the program was created, but upon who had the burden of funding it when article XIII B went into effect. Our conclusion in *Lucia Mar* that the educational program there in issue was a "new" program as to the school districts was not based on the presence or absence of any antecedent statutory obligation therefor. *Lucia Mar* determined that whether the program was new *as to the districts* depended on *when* they were compelled to assume the obligation to partially fund an existing program which they had not funded at the time article XIII B became effective.

The state further relies on two decisions, *Madera Community Hospital* v. *County of Madera* (1984) 155 Cal.App.3d 136 [201 Cal.Rptr. 768] and *Cooke* v. *Superior Court* (1989) 213 Cal.App.3d 401 [261 Cal.Rptr. 706], which hold that the county has a statutory obligation to provide medical care for indigents, but that it need not provide precisely the same level of services as the state provided under Medi-Cal.[13] Both are correct, but irrelevant to this case.[14] The county's obligation to MIA's is defined by Welfare and Institutions Code section 17000, not by the former Medi-Cal program.[15] If the

---

[12]The state's repeated emphasis on the "temporary" nature of its funding is a form of post hoc reasoning. At the time article XIII B was enacted, the voters did not know which programs would be temporary and which permanent.

[13]It must, however, provide a *comparable* level of services. (See *Board of Supervisors* v. *Superior Court* (1989) 207 Cal.App.3d 552, 564 [254 Cal.Rptr. 905].)

[14]Certain language in *Madera Community Hospital* v. *County of Madera, supra,* 155 Cal.App.3d 136, however, is questionable. That opinion states that the "Legislature intended that County bear an obligation to its poor and indigent residents, *to be satisfied from county funds*, notwithstanding federal or state programs which exist concurrently with County's obligation and alleviate, to a greater or lesser extent, County's burden." (P. 151.) Welfare and Institutions Code section 17000 by its terms, however, requires the county to provide support to residents only "when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions." Consequently, to the extent that the state or federal governments provide care for MIA's, the county's obligation to do so is reduced pro tanto.

[15]The county's right to subvention funds under article XIII B arises because its duty to care for MIA's is a state-mandated responsibility; if the county had no duty, it would have no right to funds. No claim is made here that the funding of medical services for the indigent shifted

state, in transferring an obligation to the counties, permits them to provide less services than the state provided, the state need only pay for the lower level of services. But it cannot escape its responsibility entirely, leaving the counties with a state-mandated obligation and no money to pay for it.

The state's arguments are also undercut by the fact that it continues to use the approximately $1 billion in spending authority, generated by its previous total funding of the health care program in question, as a portion of its initial *base spending limit* calculated pursuant to sections 1 and 3 of article XIII B. In short, the state may maintain here that care for MIA's is a county obligation, but when it computes its appropriation limit it treats the entire cost of such care as a state program.

## IV. CONCLUSION

This is a time when both state and county governments face great financial difficulties. The counties, however, labor under a disability not imposed on the state, for article XIII A of the Constitution severely restricts their ability to raise additional revenue. It is, therefore, particularly important to enforce the provisions of article XIII B which prevent the state from imposing additional obligations upon the counties without providing the means to comply with these obligations.

The present majority opinion disserves the public interest. It denies standing to enforce article XIII B both to those persons whom it was designed to protect—the citizens and taxpayers—and to those harmed by its violation— the medically indigent adults. And by its reliance on technical grounds to avoid coming to grips with the merits of plaintiffs' appeal, it permits the state to continue to violate article XIII B and postpones the day when the medically indigent will receive adequate health care.

Mosk, J., concurred.

---

to Alameda County is not a program " 'mandated' " by the state; i.e., that Alameda County has any option other than to pay these costs. (*Lucia Mar Unified School Dist.* v. *Honig, supra,* 44 Cal.3d at pp. 836-837.)