Filed 12/19/17

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| DEPARTMENT OF FINANCE et al., | C070357 |
| Plaintiffs and Respondents, | (Super. Ct. No. 34-2010-80000604-CU-WM-GDS) |
| v. | |
| COMMISSION ON STATE MANDATES, | |
| Defendant; | |
| COUNTY OF SAN DIEGO et al., | |
| Real Parties in Interest and Appellants. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Allen Sumner, Judge. Reversed with directions.

Thomas E. Montgomery, County Counsel, Timothy M. Barry, Chief Deputy, James R. O'Day, Senior Deputy, Office of the County Counsel, County of San Diego; Best Best & Krieger, Shawn Hagerty; and Lounsbery Ferguson Altona & Peak, Helen Holmes Peak for Real Parties in Interest and Appellants.

Shanda M. Beltran and Andrew W. Henderson for Building Industry Legal Defense Foundation as Amicus Curiae on behalf of Real Parties in Interest and Appellants.

Somach Simmons & Dunn, Theresa A. Dunham, and Nicholas A. Jacobs for the California Stormwater Quality Association as Amicus Curiae on behalf of Real Parties in Interest and Appellants.

Morrison & Foerster and Robert L. Falk for Santa Clara Valley Urban Runoff Pollution Prevention Program as Amicus Curiae on behalf of Real Parties in Interest and Appellants.

Pamela J. Walls, County Counsel, Karin Watts-Bazan, Principal Deputy County Counsel, Office of the County Counsel, County of Riverside, for Riverside County Flood Control and Water Conservation District and County of Riverside as Amici Curiae on behalf of Real Parties in Interest and Appellants.

Meyers Nave Riback Silver & Watson and Gregory J. Newmark for Alameda Countywide Clean Water Program as Amicus Curiae on behalf of Real Parties in Interest and Appellants.

Kamala D. Harris and Xavier Becerra, Attorneys General, Douglas J. Woods, Senior Assistant Attorney General, Peter K. Southworth, Nelson R. Richards, and Kathleen A. Lynch, Deputy Attorneys General, for Plaintiffs and Respondents.

No appearance for Defendant.

The California Constitution requires the state to provide a subvention of funds to compensate local governments for the costs of a new program or higher level of service the state mandates.  (Cal. Const., art. XIII B, § 6 (section 6).  Subvention is not available if the state imposes a requirement that is mandated by the federal government, unless the state order mandates costs that exceed those incurred under the federal mandate.  (Gov. Code, § 17556, subd. (c).)  The Commission on State Mandates (the Commission) adjudicates claims for subvention.

2

In *Department of Finance v. Commission on State Mandates* (2016) 1 Cal.5th 749 (*Department of Finance*), the California Supreme Court upheld a Commission ruling that certain conditions a regional water quality control board imposed on a storm water discharge permit issued under federal and state law required subvention and were not federal mandates. The high court found no federal law, regulation, or administrative case authority expressly required the conditions. It ruled the federal requirement that the permit reduce pollution impacts to the "maximum extent practicable" was not a federal mandate, but rather vested the regional board with discretion to choose which conditions to impose to meet the standard. The permit conditions resulting from the exercise of that choice were state mandates.

In this appeal, we face the same issue. The parties and the permit conditions are different, but the legal issue is the same—whether the Commission correctly determined that conditions imposed on a federal and state storm water permit by a regional water quality control board are state mandates. The Commission reached its decision by applying the standard the Supreme Court later adopted in *Department of Finance*. The trial court, reviewing the case before *Department of Finance* was issued, concluded the Commission had applied the wrong standard, and it remanded the matter to the Commission for further proceedings.

Following the analytical regime established by *Department of Finance*, we reverse the trial court's judgment. We conclude the Commission applied the correct standard and the permit requirements are state mandates. We reach this conclusion on the same grounds the high court in *Department of Finance* reached its conclusion. No federal law, regulation, or administrative case authority expressly required the conditions. The requirement to reduce pollution impacts to the "maximum extent practicable" was not a federal mandate, but instead vested the regional board with discretion to choose which conditions to impose to meet the standard. The permit conditions resulting from the exercise of that choice in this instance were state mandates.

3

We remand the matter so the trial court may consider other issues the parties raised in their pleadings but the court did not address.

BACKGROUND

In *Department of Finance*, the Supreme Court explained the storm water discharge permitting system and the constitutional reimbursement system in detail. We quote from the opinion at length:

A.    *The storm water discharge permitting system*

"The Operators' municipal storm sewer systems discharge both waste and pollutants.[1] State law controls 'waste' discharges. (Wat. Code, § 13265.) Federal law regulates discharges of 'pollutant[s].' (33 U.S.C. § 1311(a).) Both state and later-enacted federal law require a permit to operate such systems.

"California's Porter-Cologne Water Quality Control Act (Porter-Cologne Act or the Act; Wat. Code, § 13000 et seq.) was enacted in 1969. It established the State Water Resources Control Board (State Board), along with nine regional water quality control boards, and gave those agencies 'primary responsibility for the coordination and control of water quality.' (Wat. Code, § 13001; see *City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 619 (*City of Burbank*).) The State Board establishes statewide policy. The regional boards formulate and adopt water quality control plans and issue permits governing the discharge of waste. (*Building Industry Assn. of San Diego County v. State Water Resources Control Bd.* (2004) 124 Cal.App.4th 866, 875 (*Building Industry*).)

---

1    "The systems at issue here are 'municipal separate storm sewer systems,' sometimes referred to by the acronym 'MS4.' (40 C.F.R. § 122.26(b)(19) (2001) [].) A '[m]unicipal separate storm sewer' is a system owned or operated by a public agency with jurisdiction over disposal of waste and designed or used for collecting or conveying storm water. (40 C.F.R. § 122.26(b)(8) (2001) [].) Unless otherwise indicated, all further citations to the Code of Federal Regulations are to the 2001 version."

4

"The Porter-Cologne Act requires any person discharging, or proposing to discharge, waste that could affect the quality of state waters to file a report with the appropriate regional board.  (Wat. Code, § 13260, subd. (a)(1).)  The regional board then 'shall prescribe requirements as to the nature' of the discharge, implementing any applicable water quality control plans.  (Wat. Code, § 13263, subd. (a).)  The Operators must follow all requirements set by the Regional Board.  (Wat. Code, §§ 13264, 13265.)

"The federal Clean Water Act (the CWA; 33 U.S.C. § 1251 et seq.) was enacted in 1972, and also established a permitting system.  The CWA is a comprehensive water quality statute designed to restore and maintain the chemical, physical, and biological integrity of the nation's waters.  (*City of Burbank, supra,* 35 Cal.4th at p. 620.)  The CWA prohibits pollutant discharges unless they comply with (1) a permit (see 33 U.S.C. §§ 1328, 1342, 1344); (2) established effluent limitations or standards (see 33 U.S.C. §§ 1312, 1317); or (3) established national standards of performance (see 33 U.S.C. § 1316).  (33 U.S.C. § 1311(a).)  The CWA allows any state to adopt and enforce its own water quality standards and limitations, so long as those standards and limitations are not 'less stringent' than those in effect under the CWA.  (33 U.S.C. § 1370.)

"The CWA created the National Pollutant Discharge Elimination System (NPDES), authorizing the Environmental Protection Agency (EPA) to issue a permit for any pollutant discharge that will satisfy all requirements established by the CWA or the EPA Administrator.  (33 U.S.C. § 1342(a)(1), (2).)  The federal system notwithstanding, a state may administer its own permitting system if authorized by the EPA.[2]  If the EPA concludes a state has adequate authority to administer its proposed program, it must grant

---

**2**    "For a state to acquire permitting authority, the governor must give the EPA a 'description of the program [the state] proposes to establish,' and the attorney general must affirm that the laws of the state 'provide adequate authority to carry out the described program.'  (33 U.S.C. § 1342(b).)"

approval (33 U.S.C. § 1342(b)) and suspend its own issuance of permits (33 U.S.C. § 1342(c)(1)).[3]

"California was the first state authorized to issue its own pollutant discharge permits. (*People ex rel. State Water Resources Control Bd. v. Environmental Protection Agency* (9th Cir. 1975) 511 F.2d 963, 970, fn. 11, revd. on other grounds in *EPA v. State Water Resources Control Board* (1976) 426 U.S. 200 [48 L.Ed.2d 578].) Shortly after the CWA's enactment, the Legislature amended the Porter-Cologne Act, adding chapter 5.5 (Wat. Code, § 13370 et seq.) to authorize state issuance of permits (Wat. Code, § 13370, subd. (c)). The Legislature explained the amendment was 'in the interest of the people of the state, in order to avoid direct regulation by the federal government of persons already subject to regulation under state law pursuant to [the Porter-Cologne Act].' (*Ibid*.) The Legislature provided that chapter 5.5 be 'construed to ensure consistency' with the CWA. (Wat. Code, § 13372, subd. (a).) It directed that state and regional boards issue waste discharge requirements 'ensur[ing] compliance with all applicable provisions of the [CWA] . . . *together with any more stringent effluent standards or limitations* necessary to implement water quality control plans, or for the protection of beneficial uses, or to prevent nuisance.' (Wat. Code, § 13377, italics added.)[4] To align the state and federal permitting systems, the legislation provided that the term ' "waste discharge requirements" ' under the Act was equivalent to the term ' "permits" ' under the CWA. (Wat. Code, § 13374.) Accordingly, California's permitting system now regulates discharges under both state and federal law.

---

**3** "The EPA may withdraw approval of a state's program (33 U.S.C. § 1342(c)(3)), and also retains some supervisory authority: States must inform the EPA of all permit applications received and of any action related to the consideration of a submitted application (33 U.S.C. § 1342(d)(1))."

**4** The federal CWA does not prevent states from imposing any permit requirements that are more stringent than the CWA requires. (33 U.S.C. § 1370.)

(*WaterKeepers Northern California v. State Water Resources Control Bd.* (2002) 102 Cal.App.4th 1448, 1452; accord, *Building Industry, supra,* 124 Cal.App.4th at p. 875.)

"In 1987, Congress amended the CWA to clarify that a permit is required for any discharge from a municipal storm sewer system serving a population of 100,000 or more. (33 U.S.C. § 1342(p)(2)(C), (D).) Under those amendments, a permit may be issued either on a system- or jurisdiction-wide basis, must effectively prohibit non-stormwater discharges into the storm sewers, and must 'require controls to reduce the discharge of pollutants *to the maximum extent practicable*.' (33 U.S.C. § 1342(p)(3)(B), italics added.) The phrase 'maximum extent practicable' is not further defined. How that phrase is applied, and by whom, are important aspects of this case.

"EPA regulations specify the information to be included in a permit application. (See 40 C.F.R. § 122.26(d)(1)(i)-(vi), (2)(i)-(viii).) Among other things, an applicant must set out a proposed management program that includes management practices; control techniques; and system, design, and engineering methods to reduce the discharge of pollutants to the maximum extent practicable. (40 C.F.R. § 122.26(d)(2)(iv).) The permit-issuing agency has discretion to determine which practices, whether or not proposed by the applicant, will be imposed as conditions. (*Ibid*.)" (*Department of Finance, supra,* 1 Cal.5th at pp. 755-757, original italics.)[5]

B.    *The permit before us*

In 2007, the Regional Water Quality Control Board, San Diego Region (the San Diego Regional Board), issued a permit to real parties in interest and appellants, the County of San Diego and the cities located in the county (the "permittees" or

---

[5]    Using the Porter-Cologne Act's name for a permit application, the NPDES permit application in California is referred to as a Report of Waste Discharge.

"copermittees").[6] The permit was actually a renewal of an NPDES permit first issued in 1990 and renewed in 2001. The San Diego Regional Board stated the new permit "specifies requirements necessary for the Copermittees to reduce the discharge of pollutants in urban runoff to the maximum extent practicable (MEP)." The San Diego Regional Board found that although the permittees had generally been implementing the management programs required in the 2001 permit, "urban runoff discharges continue to cause or contribute to violations of water quality standards. This [permit] contains new or modified requirements that are necessary to improve Copermittees' efforts to reduce the discharge of pollutants in urban runoff to the MEP and achieve water quality standards."

The permit requires the permittees to implement various programs to manage their urban runoff that were not required in the 2001 permit. It requires the permittees to implement programs in their own jurisdictions. It requires the permittees in each watershed to collaborate to implement programs to manage runoff from that watershed, and it requires all of the permittees in the region to collaborate to implement programs to manage regional runoff. The permit also requires the permittees to assess the effectiveness of their programs and collaborate in their efforts.

The specific permit requirements involved in this case require the permittees to do the following:

(1)     As part of their jurisdictional management programs:

(a)     Sweep streets at certain times, depending on the amount of debris they generate, and report the number of curb miles swept and tons of material collected;

---

**6**     Real parties in interest and appellants are the County of San Diego and the Cities of Carlsbad, Chula Vista, Coronado, Del Mar, El Cajon, Encinitas, Escondido, Imperial Beach, La Mesa, Lemon Grove, National City, Oceanside, Poway, San Diego, San Marcos, Santee, Solana Beach, and Vista.

8

(b)     Inspect, maintain, and clean catch basins, storm drain inlets, and other storm water conveyances at specified times and report on those activities;

(c)     Collaboratively develop and individually implement a hydromodification management plan to manage increases in runoff discharge rates and durations;[7]

(d)     Collectively update the best management practices requirements listed in their local Standard Urban Storm Water Mitigation Plans (SUSMP's) and add low impact development best management practices for new real property development and redevelopment;

(e)     Individually implement an education program using all media to inform target communities about municipal separate storm sewer systems (MS4's) and impacts of urban runoff, and to change the communities' behavior and reduce pollutant releases to MS4's;

(2)     As part of their watershed management programs, collaboratively develop and implement watershed water quality activities and education activities within established schedules and by means of frequent regularly scheduled meetings;

(3)     As part of their regional management programs:

(a)     Collaboratively develop and implement a regional urban runoff management program to reduce the discharge of pollutants from MS4's to the maximum extent practicable;

(b)     Collaboratively develop and implement a regional education program focused on residential sources of pollutants;

---

[7]     Hydromodification is the "change in the natural watershed hydrologic processes and runoff characteristics . . . caused by urbanization or other land use changes that result in increased stream flows and sediment transport."

(4)     Annually assess the effectiveness of the jurisdictional, watershed, and regional urban runoff management programs, and collaboratively develop a long-term effectiveness assessment to assess the effectiveness of all of the urban runoff management programs; and

(5)     Jointly execute a memorandum of understanding, joint powers authority, or other formal agreement that defines the permittees' responsibilities under the permit and establishes a management structure, standards for conducting meetings, guidelines for workgroups, and a process to address permittees' noncompliance with the formal agreement.

The permittees estimated complying with these conditions would cost them more than $66 million over the life of the permit.

C.     *Reimbursement for state mandates*

"[W]hen the Legislature or a state agency requires a local government to provide a new program or higher level of service, the state must 'reimburse that local government for the costs of the program or increased level of service.' (Cal. Const., art. XIII B, § 6, subd. (a) (hereafter, section 6).)[8]" (*Department of Finance, supra,* 1 Cal.5th at pp 758-759.)

"Voters added article XIII B to the California Constitution in 1979. Also known as the ' "Gann limit," ' it 'restricts the amounts state and local governments may appropriate and spend each year from the "proceeds of taxes." ' (*City of Sacramento v. State of California* (1990) 50 Cal.3d 51, 58-59 (*City of Sacramento*).) 'Article XIII B is to be distinguished from article XIII A, which was adopted as Proposition 13 at the June

---

[8]     " ' "Costs mandated by the state" means any increased costs which a local agency or school district is required to incur . . . as a result of any statute enacted on or after January 1, 1975, or any executive order implementing any statute enacted on or after January 1, 1975, which mandates a new program or higher level of service of an existing program within the meaning of Section 6 of Article XIII B of the California Constitution.' (Gov. Code, § 17514.)"

1978 election. Article XIII A imposes a direct constitutional limit on state and local power to *adopt and levy taxes*. Articles XIII A and XIII B work in tandem, together restricting California governments' power both to levy and to spend for public purposes.' (*Id.* at p. 59, fn. 1.)

"The 'concern which prompted the inclusion of section 6 in article XIII B was the perceived attempt by the state to enact legislation or adopt administrative orders creating programs to be administered by local agencies, thereby transferring to those agencies the fiscal responsibility for providing services which the state believed should be extended to the public.' (*County of Los Angeles v. State of California* (1987) 43 Cal.3d 46, 56.) The reimbursement provision in section 6 was included in recognition of the fact 'that articles XIII A and XIII B severely restrict the taxing and spending powers of local governments.' (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 81 (*County of San Diego*).) The purpose of section 6 is to prevent 'the state from shifting financial responsibility for carrying out governmental functions to local agencies, which are "ill equipped" to assume increased financial responsibilities because of the taxing and spending limitations that articles XIII A and XIII B impose.' (*County of San Diego*, at p. 81.) Thus, with certain exceptions, section 6 'requires the state "to pay for any new governmental programs, or for higher levels of service under existing programs, that it imposes upon local governmental agencies." ' (*County of San Diego*, at p. 81.)" (*Department of Finance, supra,* 1 Cal.5th at pp. 762-763, original italics.)

A significant exception to section 6's subvention requirement is at issue here. Under that exception, "reimbursement is not required if '[t]he statute or executive order imposes a requirement that is mandated by a federal law or regulation and results in costs mandated by the federal government, unless the statute or executive order mandates costs that exceed the mandate in that federal law or regulation.' (Gov. Code, § 17556, subd. (c).)

11

"The Legislature has enacted comprehensive procedures for the resolution of reimbursement claims (Gov. Code, § 17500 et seq.) and created the Commission to adjudicate them (Gov. Code, §§ 17525, 17551). It also established 'a test-claim procedure to expeditiously resolve disputes affecting multiple agencies.' (*Kinlaw v. State of California* (1991) 54 Cal.3d 326, 331 (*Kinlaw*).)

"The first reimbursement claim filed with the Commission is called a test claim. (Gov. Code, § 17521.) The Commission must hold a public hearing, at which the Department of Finance (the Department), the claimant, and any other affected department or agency may present evidence. (Gov. Code, §§ 17551, 17553.) The Commission then determines 'whether a state mandate exists and, if so, the amount to be reimbursed.' (*Kinlaw, supra,* 54 Cal.3d at p. 332.) The Commission's decision is reviewable by writ of mandate. (Gov. Code, § 17559.)" (*Department of Finance, supra,* 1 Cal.5th at pp. 758-759.)

D.     *The test claim and the writ petition*

In 2008, the permittees filed a test claim with the Commission. They contended the permit requirements mentioned above constituted new or modified requirements that were compensable state mandates under section 6. The State, the San Diego Regional Board and the Department of Finance (collectively the "State") claimed the requirements were not compensable because they were mandated by the federal CWA's NPDES permit requirements.

In 2010, the Commission ruled all of the targeted requirements were state mandates and not federal mandates. The Commission found the requirements were not federal mandates because they were not expressly specified in, or they exceeded the scope of, federal regulations. The Commission determined the permittees were entitled to subvention by the state for all of the requirements except two. The Commission ruled the requirements to develop a hydromodification plan and to include low impact

12

development practices in the SUSMP's were not entitled to subvention because the permittees had authority to impose fees to recover the costs of those requirements.

The State petitioned the trial court for a writ of administrative mandate. It contended the Commission erred because the permit requirements are federal mandates and are not a new program or higher level of service. It also contended the Commission erred in concluding the County of San Diego did not have fee authority to pay for all of the permit conditions.

The County of San Diego filed a cross-petition for writ of mandate to challenge the Commission's decision that the conditions requiring a hydromodification plan and low impact development practices were not reimbursable.

The trial court granted the State's petition in part and issued a writ of mandate. It concluded the Commission applied an incorrect standard when it determined the permit conditions were not federal mandates. It held the Commission was required to determine whether any of the permit requirements exceeded the "maximum extent practicable" standard imposed by the CWA. "The Commission never undertook this inquiry," the court stated. "Instead, it simply asked whether the permit conditions are expressly specified in federal regulations or guidelines. This is not the test. The fact that a permit condition is not specified in a federal regulation or guideline does not determine whether the condition is 'practicable,' and thus required by federal law. The mere fact that a permit condition is not promulgated as a federal regulation does not mean it exceeds the federal standard."

The trial court remanded the matter to the Commission to reconsider its decision in light of the court's ruling. The court did not address the fee issues raised by the petition and cross-petition.

13

The permittees appeal from the trial court's judgment.[9] [10]

## DISCUSSION

### I

### *Standard of Review*

While this appeal was pending, the Supreme Court issued *Department of Finance*. There, the high court had to answer the same question we must answer: are certain requirements imposed by the San Diego Regional Board in an NPDES permit federal mandates and not reimbursable state mandates? Although the high court reviewed conditions different from those before us, it established the law we must apply to resolve this appeal.[11]

As to the standard of review, "[t]he question whether a statute or executive order imposes a mandate is a question of law. [(*City of San Jose v. State of California* (1996) 45 Cal.App.4th 1802, 1810.)] Thus, we review the entire record before the Commission, which includes references to federal and state statutes and regulations, as well as evidence of other permits and the parties' obligations under those permits, and

---

[9] The permittees request we take judicial notice of the NPDES permit the San Diego Regional Board issued to them in 2013 that allegedly contains less specific conditions. The State requests we take judicial notice of an NPDES permit issued by the EPA in 2011 to the District of Columbia that includes a condition similar to one above. We deny both of these requests. Neither document was before the Commission or the trial court at the time those bodies ruled in this matter, and no exceptional circumstances justify deviating from that rule. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.) The State has also requested we take judicial notice of the NPDES permit at issue in *Department of Finance* pursuant to subdivisions (c) and (d) of Evidence Code section 452. We grant that request.

[10] Building Industry Legal Defense Foundation and the California Stormwater Quality Association, et al., filed amicus curiae briefs in support of the permittees.

[11] At our request, the parties briefed the effect of *Department of Finance* on this appeal.

14

independently determine whether it supports the Commission's conclusion that the conditions here were not federal mandates.  (*Ibid*.)"  (*Department of Finance, supra,* 1 Cal.5th at p. 762.)  To do this, we must determine "whether federal statutory, administrative, or case law imposed, or compelled the [San Diego] Regional Board to impose, the challenged requirements on the [permittees]."  (*Id.* p. 767.)

II

*Analysis*

Under the test announced in *Department of Finance*, we conclude federal law did not compel imposition of the permit requirements, and they are subject to subvention under section 6.  This is because the requirement to reduce pollutants to the "maximum extent practicable" was not a federal mandate for purposes of section 6.  Rather, it vested the San Diego Regional Board with discretion to choose how the permittees must meet that standard, and the exercise of that discretion resulted in imposing a state mandate.  We also find no federal law, regulation, or administrative case authority that, under the test provided by *Department of Finance*, expressly required the conditions the San Diego Regional Board imposed.

A.    *The* Department of Finance *decision*

We first describe *Department of Finance*, its context, its holding, and its analysis.  Prior to its *Department of Finance* decision, the California Supreme Court declared in *City of Sacramento, supra*, 50 Cal.3d 51 that "certain regulatory standards imposed by the federal government under 'cooperative federalism' schemes" are federal mandates and not reimbursable under section 6.  (*Id.* at pp. 73-74.)  In that case, the court held federal legislation requiring local governments to provide unemployment insurance protection to their employees was a federal mandate.  It was a federal mandate because failing to extend the protection would have resulted in the state's businesses facing additional unemployment taxation and penalties by both state and federal governments.  (*Id.* at p. 74.)  "[T]he state simply did what was necessary to avoid certain and severe

15

federal penalties upon its resident businesses. The alternatives were so far beyond the realm of practical reality that they left the state 'without discretion' to depart from federal standards." (*Ibid*.)

The *City of Sacramento* court refused to announce a "final test" for determining whether a requirement imposed under a cooperative federal-state program was a federal mandate. (*City of Sacramento, supra,* 50 Cal.3d at p. 76.) Instead, it required courts to determine whether a requirement was a federal mandate on a case-by-case basis. It stated: "Given the variety of cooperative federal-state-local programs, we here attempt no final test for 'mandatory' versus 'optional' compliance with federal law. A determination in each case must depend on such factors as the nature and purpose of the federal program; whether its design suggests an intent to coerce; when state and/or local participation began; the penalties, if any, assessed for withdrawal or refusal to participate or comply; and any other legal and practical consequences of nonparticipation, noncompliance, or withdrawal. Always, the courts and the Commission must respect the governing principle of article XIII B, section 9, subd. (b) [of the California Constitution]: neither state nor local agencies may escape their spending limits when their participation in federal programs is truly voluntary." (*City of Sacramento, supra*, at p. 76.)

In *Department of Finance*, the Supreme Court changed course and announced a test for determining whether a requirement imposed on a permit under a cooperative federal-state program is a federal mandate. To determine whether a requirement imposed under the CWA and state law on an NPDES permit is a federal mandate, a court applies the following test: "If federal law compels the state to impose, or itself imposes, a requirement, that requirement is a federal mandate. On the other hand, if federal law gives the state discretion whether to impose a particular implementing requirement, and the state exercises its discretion to impose the requirement by virtue of a 'true choice,' the requirement is not federally mandated." (*Department of Finance*, *supra*, 1 Cal.5th at p. 765.) If the state in opposition to the petition contends its requirements are federal

16

mandates, it has the burden to establish the requirements are in fact mandated by federal law. (*Id.* at p. 769.)

In *Department of Finance*, the high court held conditions imposed on an NPDES permit issued by the Regional Water Quality Control Board, Los Angeles Region (the Los Angeles Regional Board), to Los Angeles County and various cities were not federal mandates and were subject to subvention under section 6. The permit conditions required the permittees to install and maintain trash receptacles at transit stops, and to inspect certain commercial and industrial facilities and construction sites. (*Department of Finance*, *supra*, 1 Cal.5th at p. 755.) The Commission determined each of the conditions was a compensable state mandate, and the Supreme Court, reversing the Court of Appeal, upheld the Commission's decision.

The high court ruled federal law did not compel the conditions to be imposed. The court stated: "It is clear federal law did not compel the [Los Angeles] Regional Board to impose these particular requirements. There was no evidence the state was compelled to administer its *own* permitting system rather than allowing the EPA do so under the CWA. (33 U.S.C. § 1342(a).) . . . [T]he state chose to administer its own program, finding it was 'in the interest of the people of the state, *in order to avoid direct regulation by the federal government* of persons already subject to regulation' under state law. (Wat. Code, § 13370, subd. (c), italics added.) Moreover, the [Los Angeles] Regional Board was not required by federal law to impose any specific permit conditions. The federal CWA broadly directed the board to issue permits with conditions designed to reduce pollutant discharges to the maximum extent practicable. But the EPA's regulations gave the board discretion to determine which specific controls were necessary to meet that standard. (40 C.F.R. § 122.26(d)(2)(iv).) This case is distinguishable from *City of Sacramento*, *supra*, 50 Cal.3d 51, where the state risked the loss of subsidies and tax credits for all its resident businesses if it failed to comply with federal legislation. Here, the State was not compelled by federal law to impose any particular requirement.

17

Instead, . . . the [Los Angeles] Regional Board had discretion to fashion requirements which it determined would meet the CWA's maximum extent practicable standard." (*Department of Finance*, *supra*, 1 Cal.5th at pp. 767-768, original italics.)

The State contended the Commission decided the existence of a federal mandate on grounds that were too rigid. It argued the Commission should have accounted for the flexibility in the CWA's regulatory scheme and the "maximum extent practicable" standard. It also should have deferred to the terms of the permit as the best expression of what federal law required in that instance since the terms were based on the agencies' scientific, technical, and experiential knowledge.

The Supreme Court rejected both arguments. The court stated: "We disagree that the Permit itself demonstrates what conditions would have been imposed had the EPA granted the Permit. In issuing the Permit, the [Los Angeles] Regional Board was implementing both state and federal law and was authorized to include conditions more exacting than federal law required. (*City of Burbank, supra*, 35 Cal.4th at pp. 627-628.) It is simply not the case that, because a condition was in the Permit, it was, ipso facto, required by federal law.

"We also disagree that the Commission should have deferred to the [Los Angeles] Regional Board's conclusion that the challenged requirements were federally mandated. That determination is largely a question of law. Had the [Los Angeles] Regional Board found, when imposing the disputed permit conditions, that those conditions were the only means by which the maximum extent practicable standard could be implemented, deference to the board's expertise in reaching that finding would be appropriate. The board's legal authority to administer the CWA and its technical experience in water quality control would call on sister agencies as well as courts to defer to that finding. The State, however, provides no authority for the proposition that, absent such a finding, the Commission should defer to a state agency as to whether requirements were state or federally mandated. Certainly, in a trial court action challenging the *board's authority* to

18

impose specific permit conditions, the board's findings regarding what conditions satisfied the federal standard would be entitled to deference. (See, e.g., *City of Rancho Cucamonga v. Regional Water Quality Control Bd*. (2006) 135 Cal.App.4th 1377, 1384, citing *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817-818.) Resolution of those questions would bring into play the particular technical expertise possessed by members of the regional board. In those circumstances, the party challenging the board's decision would have the burden of demonstrating its findings were not supported by substantial evidence or that the board otherwise abused its discretion. (*Rancho Cucamonga*, at p. 1387; *Building Industry, supra*, 124 Cal.App.4th at pp. 888-889.)

"Reimbursement proceedings before the Commission are different. The question here was not whether the [Los Angeles] Regional Board had authority to impose the challenged requirements. It did. The narrow question here was who will pay for them. In answering that legal question, the Commission applied California's constitutional, statutory, and common law to the single issue of reimbursement. In the context of these proceedings, the State has the burden to show the challenged conditions were mandated by federal law." (*Department of Finance*, *supra*, 1 Cal.5th at pp. 768-769, fn. omitted, original italics.)

Addressing the permit's specific requirements, the Supreme Court determined they were not mandated by federal law but instead were imposed pursuant to the State's discretion. Regarding the site inspection requirements, the court found neither the CWA's "maximum extent practicable" standard, the CWA itself, nor the EPA regulations "expressly required" the inspection conditions. (*Department of Finance*, *supra*, 1 Cal.5th at p. 770.) The court also determined that in this instance, state and federal law required the Los Angeles Regional Board to conduct the inspections. By exercising its discretion and shifting responsibility for the inspections onto the permittees as a condition of the permit, the Los Angeles Regional Board imposed a state mandate. (*Id*. at pp. 770-771.)

The State argued the inspection requirements were federal mandates because EPA regulations contemplated that some kind of operator inspections would be required. The court was not persuaded: "That the EPA regulations contemplated some form of inspections . . . does not mean that federal law required the scope and detail of inspections required by the Permit conditions." (*Department of Finance*, *supra*, 1 Cal.5th at p. 771, fn. omitted.)

As for the trash receptacle requirement, the Supreme Court agreed with the Commission that it was not a federal mandate because neither the CWA nor the federal regulation cited by the state "explicitly required" the installation and maintenance of trash receptacles. (*Department of Finance*, *supra*, 1 Cal.5th at p. 771.)

The State argued the condition was mandated by the EPA regulations that required the permittees to include in their application a description of practices for operating roads and procedures for reducing the impact of discharges from MS4's. The Supreme Court rejected this argument: "While the Operators were required to include a description of practices and procedures in their permit application, the issuing agency has discretion whether to make those practices conditions of the permit. (40 C.F.R. § 122.26(d)(2)(iv).) No regulation cited by the State required trash receptacles at transit stops." (*Department of Finance*, *supra*, 1 Cal.5th at pp. 771-772.)

In addition, the court found evidence the EPA had issued NPDES permits in other cities that did not require trash receptacles at transit stops. "The fact the EPA itself had issued permits in other cities, but did not include the trash receptacle condition, undermines the argument that the requirement was federally mandated." *(Department of Finance*, *supra*, 1 Cal.5th at p. 772.)

B.      *Applying* Department of Finance *to this appeal*

Having reviewed *Department of Finance*, we now turn to apply its ruling and analysis to the permit requirements before us. Again, our task is two-fold. We must determine first whether the CWA, its regulations and guidelines, and any other evidence

20

of federal mandate such as similar permits issued by the EPA, required each condition. If they did, we conclude the requirement is a federal mandate and not entitled to subvention under section 6. Second, if the condition was not "expressly required" by federal law but was instead imposed pursuant to the State's discretion, we conclude the requirement is not federally mandated and subvention is required. The State has the burden to establish the requirements were imposed by federal law. It has not met its burden here.

1. *The "maximum extent practicable" standard*

The State contends the permit requirements were federal mandates because it had no discretion but to impose conditions that satisfied the "maximum extent practicable" standard. We disagree with the state's interpretation of its discretion. The "maximum extent practicable" standard by its nature is discretionary and does not by itself impose a federal mandate for purposes of section 6. Before *Department of Finance* was issued, the State argued here that the Clean Water Act's "maximum extent practicable" standard was a federal mandate because it is flexible and contemplates that specific measures will be implemented to meet the unique requirements of any particular waterway and water quality. *Department of Finance* rejected this argument for purposes of subvention under section 6. "The federal CWA broadly directed the board to issue permits with conditions designed to reduce pollutant discharges to the maximum extent practicable. But the EPA's regulations gave the board discretion to determine which specific controls were necessary to meet that standard. (40 C.F.R. § 122.26(d)(2)(iv).)" (*Department of Finance*, *supra*, 1 Cal.5th at pp. 767-768.)

There is no dispute the CWA and its regulations grant the San Diego Regional Board discretion to meet the "maximum extent practicable" standard. The CWA requires NPDES permits for MS4's to "require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions *as the Administrator*

21

*or the State determines appropriate* for the control of such pollutants." (33 U.S.C.S. § 1342(p)(3)(B)(iii), italics added.)

EPA regulations also describe the discretion the State will exercise to meet the "maximum extent practicable" standard. The regulations require a permit application by an MS4 to propose a management program. This program "shall include a comprehensive planning process which involves public participation and where necessary intergovernmental coordination, to reduce the discharge of pollutants to the maximum extent practicable using management practices, control techniques and system, design and engineering methods, and such other provisions which are appropriate. . . . Proposed programs *will be considered by the Director when developing permit conditions* to reduce pollutants in discharges to the maximum extent practicable." (40 C.F.R. § 122.26 (d)(2)(iv), italics added.) This regulation implies the San Diego Regional Board has wide discretion to determine how best to condition the permit in order to meet the "maximum extent practicable" standard.

Yet the State argues the San Diego Regional Board really did not exercise discretion in imposing the challenged requirements. It contends the Supreme Court in *Department of Finance* did not look for differences between federal law and the terms of the permit. Rather, the court allegedly searched the record to see if the Los Angeles Regional Board exercised a true choice in imposing permit conditions or if it instead imposed requirements necessary to satisfy federal law. Applying that test here, the State asserts the San Diego Regional Board in this case did not exercise a true choice in imposing any of the permit requirements because it was required to impose requirements that satisfied the "maximum extent practicable" standard. Indeed, the San Diego Regional Board here made a finding its requirements were "necessary" in order to reduce pollutant discharge to the maximum extent practicable, a finding the Los Angeles Regional Board in *Department of Finance* did not expressly make.

22

The State also contends the San Diego Regional Board did not make a true choice because the permittees in their permit application proposed methods of compliance, and the San Diego Regional Board made modifications "so those methods would achieve the federal standard." The State asserts the permit requirements were not state mandates because they were based on the proposals in the application, "not the [San Diego] Regional Board's preferences for how the copermittees should comply."

The State misconstrues *Department of Finance* in numerous respects. First, the Supreme Court did in fact look for differences between federal law and the terms of the permit to determine if the condition was a federal mandate. The high court stated that, to be a federal mandate for purposes of section 6, the federal law or regulation must "expressly" or "explicitly" require the specific condition imposed in the permit. (*Department of Finance*, *supra*, 1 Cal.5th at pp. 770-771.)

Second, the Supreme Court found the "maximum extent practicable" did not preclude the State from making a choice; rather, it gave the State discretion to make a choice. "The federal CWA broadly directed the board to issue permits with conditions designed to reduce pollutant discharges to the maximum extent practicable. But the EPA's regulations gave the board discretion to determine which specific controls were necessary to meet that standard. (40 C.F.R. § 122.26(d)(2)(iv).)" (*Department of Finance*, *supra*, 1 Cal.5th at pp. 767-768.) As the high court stated, except where a regional board finds the conditions are the only means by which the "maximum extent practicable" standard can be met, the State exercises a true choice by determining what controls are necessary to meet the standard. (*Id*. at p. 768.)

That the San Diego Regional Board found the permit requirements were "necessary" to meet the standard establishes only that the San Diego Regional Board exercised its discretion. Nowhere did the San Diego Regional Board find its conditions were the only means by which the permittees could meet the standard. Its use of the word "necessary" did not equate to finding the permit requirement was the *only* means of

meeting the standard. "It is simply not the case that, because a condition was in the Permit, it was, ipso facto, required by federal law." (*Department of Finance*, *supra*, 1 Cal.5th at p. 768.)

The use of the word "necessary" also does not distinguish this case from *Department of Finance*. By law, a regional board cannot issue an NPDES permit to MS4's without finding it has imposed conditions "necessary to carry out the provisions of [the Clean Water Act]." (33 U.S.C. § 1342(a)(1).) That requirement includes imposing conditions necessary to meet the "maximum extent practicable" standard, and the regional board in *Department of Finance* found the conditions it imposed had done so. The Los Angeles Regional Board stated: "This permit is intended to develop, achieve, and implement a timely, comprehensive, cost-effective storm water pollution control program to reduce the discharge of pollutants in storm water to the Maximum Extent Practicable (MEP) from the permitted areas in the County of Los Angeles to the waters of the U.S. subject to the Permittees' jurisdiction." It further stated: "[T]his Order requires that the [Storm Water Quality Management Plan] specify BMPs [best management practices] that will be implemented to reduce the discharge of pollutants in storm water to the maximum extent practicable."

Third, the Supreme Court in *Department of Finance* rejected the State's argument that the permit application somehow limited a board's discretion or denied it a true choice. "While the Operators were required to include a description of practices and procedures in their permit application, the issuing agency has discretion whether to make those practices conditions of the permit. (40 C.F.R. § 122.26(d)(2)(iv).)" (*Department of Finance*, *supra*, 1 Cal.5th at pp. 771-772.)

The State had a true choice and exercised its discretion in determining and imposing the conditions it concluded were necessary to reduce storm water pollutants to the maximum extent practicable. Because the State exercised this discretion, the permit requirements it imposed were not federal mandates.

## 2. *No express demand by federal law*

The State contends federal law nonetheless required the conditions it imposed. It relies on regulations broadly describing what must be included in an NPDES permit application by an MS4 instead of express mandates directing the San Diego Regional Board to impose the requirements it imposed. To be a federal mandate for purposes of section 6, however, the federal law or regulation must "expressly" or "explicitly" require the condition imposed in the permit. (*Department of Finance*, *supra*, 1 Cal.5th at pp. 770-771.) This is the standard the Commission applied and found the State's claims unwarranted. We do as well. The State cites to no law, regulation, or EPA case authority presented to the Commission or the trial court that expressly required any of the challenged permit requirements. We briefly review the requirements.

### a. *Street sweeping and cleaning storm water conveyances*

The State contends the requirements for street sweeping and cleaning of the storm sewer system are federal mandates because EPA regulations required the permittees to describe in their permit application their practices for operating and maintaining streets and procedures for reducing the impact of discharges from storm sewer systems. (40 C.F.R. § 122.26(d)(2)(iv)(A)(3).) This regulation does not expressly require the scope and detail of street sweeping and facility maintenance the permit imposes. Because the State imposed those specific requirements, they are not federal mandates and must be compensated under section 6.

The permit requires the permittees to sweep streets a certain number of times depending on how much trash and debris they generate. Streets that consistently generate the highest volume of trash must be swept at least twice per month. Streets that generate moderate volumes of trash must be swept at least monthly, and those that generate low volumes of trash must be swept at least annually. Permittees must annually report the total distance of curb miles swept and the tons of material collected.

25

The permit also requires the permittees to implement a schedule of maintenance activities for their storm sewer systems and facilities, such as catch basins, storm drain inlets, open channels, and the like. At a minimum, the permittees must inspect all facilities at least annually and must inspect facilities that receive high volumes of trash at least once a year between May 1 and September 30. The permit requires any catch basin or storm drain inlet that has accumulated trash greater than 33 percent of its design capacity to be cleaned in a timely manner. Any facility designed to be self-cleaning must be cleaned immediately of any accumulated trash. The permittees must keep records of their maintenance and cleaning activities.

We see nothing in the regulation requiring permittees to describe in their application their street and facility maintenance practices a mandate to impose the specific requirements actually imposed in the permit.

b.      *Hydromodification plan*

The State claims the requirement to develop a hydromodification plan (HMP) arises from EPA regulations requiring the permit applicant to include in its application a description of planning procedures to develop and enforce controls "to reduce the discharge of pollutants from [MS4's] which receive discharges from areas of new development and significant redevelopment." (40 C.F.R. § 122.26(d)(2)(iv)(A)(2).) The permit requires the HMP to establish standards of runoff flow for channel segments that receive runoff from new development. It must require development projects to implement control measures so that the flows from the completed project generally do not exceed the flows before the project was built. The HMP must include other performance criteria as well as a description of how the permittees will incorporate the HMP requirements into their local approval process.

The regulation cited by the State does not require an HMP. Nor does it restrict the San Diego Regional Board from exercising its discretion to require a specific type of plan to address the impacts from new development. The San Diego Regional Board

26

admittedly exercised its discretion on this condition. It determined the permittees'
application was insufficient and it required them to collaborate to develop an HMP. The
requirement is thus a state mandate subject to subvention.

c.      *Low impact development practices in the SUSMP*

The State relies upon the same regulation to support the low impact development
requirements as it did for the HMP. (40 C.F.R. § 122.26(d)(2)(iv)(A)(2).) The permit
requires the permittees to implement specified low impact development best management
practices at most new development and redevelopment projects. These practices include
designing the projects to drain runoff into previous areas on site and using permeable
surfaces for low traffic areas. The practices also require projects to conserve natural
areas and minimize the project's impervious footprint where feasible.

The permit also requires the permittees to develop a model SUSMP to establish
low impact development best management practices that meet or exceed the requirements
just mentioned. The model must include siting, design, and maintenance criteria for each
low impact development best management practice listed in the model SUSMP. Again,
nothing in the application regulation required the San Diego Regional Board to impose
these specific requirements. As a result, they are state mandates subject to section 6.

d.      *Jurisdictional and regional education programs*

The State claims regulations requiring the permittees to describe in their permit
application the educational programs they will conduct to increase the public's
knowledge of storm water pollution imposed a federal mandate. (40 C.F.R. §
122.26(d)(2)(iv)(A)(6), (B)(6), (D)(4).) The regulations require the application to include
descriptions of proposed educational activities to reduce pollutants associated with the
application of pesticides, herbicides and fertilizer (40 C.F.R. § 122.26(d)(2)(iv)(A)(6)), to
facilitate the proper management and disposal of used oil and toxic materials (40 C.F.R.
§ 122.26(d)(2)(iv)(B)(6)), and to reduce pollutants in storm runoff from construction
sites. (40 C.F.R. § 122.26(d)(2)(iv)(D)(4).)

The permit requires each permittee to do much more. Each must implement an education program using all media as appropriate to "measurably increase" the knowledge of MS4's, impacts of urban runoff, and potential best management practices, and to "measurably change" people's behaviors. The program must address at a minimum five target communities: municipal departments and personnel; construction site owners and developers; industrial owners and operators; commercial owners and operators; and the residential community, the general public, and school children. The program must educate each target community where appropriate on a number of specified topics. It must educate them on federal, state, and local water quality laws and regulations, including the storm water discharge permitting system. It must address general runoff concepts, such as the impacts of urban runoff on receiving waters, the distinctions between MS4's and sanitary sewers, types of best management practices, water quality impacts associated with urbanization, and non-storm water discharge prohibitions. It must discuss specific best management practices for such activities as good housekeeping, proper waste disposal, methods to reduce the impacts from residential and charity car washing, non-storm water disposal alternatives, preventive maintenance, and equipment and vehicle maintenance and repair. The program must also address public reporting mechanisms, illicit discharge detection, dechlorination techniques, integrated pest management, the benefits of native vegetation, water conservation, alternative materials and designs to maintain peak runoff values, traffic reduction, and alternative fuel use. The permit also requires additional specific topics to be addressed that are relevant to each particular target community.

The San Diego Regional Board imposed an educational program and a list of topics that surpasses what the regulations required the permittees to propose in their application. Nothing in the regulations required the San Diego Regional Board to impose the educational requirements in the scope and detail it did. As a result, they are state mandates subject to section 6.

28

e.     *Regional and watershed urban runoff management programs*

To claim the requirements to develop regional and watershed urban runoff management programs are federal mandates, the State relies on the regulation requiring permit applications to propose a management program as part of their application. The regulation authorizes the applicants to propose a program that imposes controls beyond a single jurisdiction: "Proposed programs *may* impose controls on a systemwide basis, a watershed basis, a jurisdiction basis, or on individual outfalls." (40 C.F.R. § 122.26(d)(2)(iv), italics added.)

The permit *requires* the permittees to collaborate, develop, and implement watershed and regional urban runoff management programs. As part of the watershed management program, the permittees must, among other things, annually assess the water quality of receiving waters and identify the water quality problems attributable to MS4 discharges. They must develop and implement a list of water quality activities and education activities and submit the list for approval by the San Diego Regional Board. The permit describes what information must be included on the list for each activity, and it requires the permittees to implement each of them.

The permit requires the permittees, as part of developing a regional management program, to implement a residential education program as described above, develop standardized fiscal analysis of the programs in their jurisdictions, and facilitate the assessment of the jurisdictional, watershed, and regional programs' effectiveness.

The regulation relied upon by the State does not mandate any of these watershed and regional management requirements. It clearly leaves to the San Diego Regional Board the discretion to require controls on a systemwide, watershed, or jurisdictional basis. The State exercised that discretion in imposing the controls it imposed. They thus are state mandates subject to section 6.

f.       *Program effectiveness assessments*

Federal regulations require a permit application to include, as part of assessing the effectiveness of controls, "[e]stimated reductions in loadings of pollutants from discharges of municipal storm sewer constituents from municipal storm sewer systems expected as the result of the municipal storm water quality management program. The assessment shall also identify known impacts of storm water controls on ground water." (40 C.F.R. § 122.26(d)(2)(v).)

The regulations also require the operator of an MS4 to submit a status report annually. The report must include: "(1) The status of implementing the components of the storm water management program that are established as permit conditions; [¶] (2) Proposed changes to the storm water management programs that are established as permit conditions[;] [¶] (3) Revisions, if necessary, to the assessment of controls and the fiscal analysis reported in the permit application[;] [¶] (4) A summary of data, including monitoring data, that is accumulated throughout the reporting year; [¶] (5) Annual expenditures and budget for year following each annual report; [¶] (6) A summary describing the number and nature of enforcement actions, inspections, and public education programs; [and] [¶] (7) Identification of water quality improvements or degradation[.]" (40 C.F.R. § 122.42(c).)

The State contends these regulations mandated the San Diego Regional Board to impose the assessment requirements the permit contains, but the permit imposes additional obligations. The permit requires the permittees to assess, among other things, the effectiveness of each significant jurisdictional activity or best management practice and each watershed water quality activity and the implementation of the jurisdictional and watershed runoff management plans. They must identify and utilize "measureable targeted outcomes, assessment measures, and assessment methods" for each of these items. They must utilize certain predefined "outcome levels" to assess the effectiveness

30

of each of the items. They must also collaborate to develop a long-term effectiveness assessment based on the same outcome levels.

While the regulations required estimated reductions in the amount of pollutants and a report on the status of implementing controls and their effectiveness, the San Diego Regional Board exercised its discretion to mandate how and to what degree of specificity those assessments would occur. The regulations did not require the San Diego Regional Board to impose the assessment systems and procedures it actually imposed. Accordingly, those systems and procedures are state mandates subject to section 6.

g. *Permittee collaboration*

EPA regulations require the permittees, as part of their application, to show they have legal authority, either by statute, ordinance, or contract, to control through interagency agreements among themselves the contribution of pollutants from a portion of the municipal system to another portion in a different jurisdiction. (40 C.F.R. § 122.26(d)(2)(i)(D).) The State claims this regulation mandated the San Diego Regional Board to require the permittees to collaborate and, in particular, execute an agreement that establishes a management structure. Under the terms of the permit, the management structure must, among other things, define the permittees' responsibilities; promote consistency, development, and implementation of regional activities; establish standards for conducting meetings, making decisions and sharing costs; and establish a process for addressing noncompliance with the agreement.

The EPA regulation did not impose on the San Diego Regional Board a mandate to define the terms and organization of a management structure that would allow the permittees to control pollutants that cross borders. The regulation required the San Diego Regional Board to assure itself the permittees had the authority to address runoff pollution regionally, but it did not require the San Diego Regional Board to define how the permittees would organize themselves to do so. The conditions of the San Diego

31

Regional Board went beyond what was federally required, and are thus state mandates subject to section 6.

In short, there is no federal law, regulation, or administrative case authority that expressly mandated the San Diego Regional Board to impose any of the challenged requirements discussed above. As a result, their imposition are state mandates, and section 6 requires the State to provide subvention to reimburse the permittees for the costs of complying with the requirements.

DISPOSITION

The judgment is reversed. The matter is remanded to the trial court for further proceedings consistent with this opinion. Costs on appeal are awarded to real parties in interest and appellants. (Cal. Rules of Court, rule 8.278(a).)


                                                          NICHOLSON          , J.



We concur:



        BLEASE          , Acting P. J.



        BUTZ           , J.


32